## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GEORGE JOSHUA HERRERA, as
personal representative of the WRONGFUL
DEATH ESTATE OF GEORGE HERRERA, and
on his own behalf, and CRYSTAL SENA,

      Plaintiffs,

v.                                                              No. 1:21-cv-465-SCY-LF

THE VILLAGE OF ANGEL FIRE
and MARK FITCH, in his individual
capacity,

      Defendants.

### MEMORANDUM OPINION AND ORDER DENYING
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case follows the death of George Herrera. Officer Mark Fitch responded to a fire at

Mr. Herrera's house and encountered Mr. Herrera holding a knife. After telling Mr. Herrera to

drop the knife, Officer Fitch shot Mr. Herrera. This suit is brought on behalf of Mr. Herrera's

estate, alleging (I) battery, (II) negligent hiring, training, and supervision, (III) violation of rights

guaranteed by Article II, Section 10 of the New Mexico Constitution, (IV) violation of rights

guaranteed by the Fourth Amendment to the United States Constitution, and (V) wrongful death.

Defendants Village of Angel Fire and Mark Fitch moved for summary judgment on all claims

and assert that Defendant Fitch is entitled to qualified immunity on count IV. Defendants filed

their motion on September 3, 2021 (Doc. 20) and it was fully briefed on October 20, 2021 (Docs.

29, 32).[1] Having reviewed the parties' submissions and the applicable law, the Court finds that a

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all
proceedings and to enter an order of judgment. Doc. 12.

reasonable jury could determine that Officer Fitch acted unreasonably in violation of the Fourth Amendment's protections and therefore denies summary judgment.

## BACKGROUND

### I.      Undisputed Facts

Defendant Mark Fitch, an officer with the Village of Angel Fire Police Department, received a call in the early morning hours of May 5, 2019, alerting him to a house on fire and a sighting of a male walking into the woods. Defendants' Undisputed Material Fact ("UMF") No. 1, Doc. 20 at 2. He went to the house and learned that Mr. George Herrera lived there. UMF No. 2. Officer Fitch knew Mr. Herrera from a previous DWI investigation and court date. Plaintiffs' Response to Defendants' Statement of Fact No. 3, Doc. 29 at 2. Over the course of those previous interactions, Officer Fitch had learned that Mr. Herrera "had had a broken back and had previously been in an oil rig explosion," which led to ongoing mobility limitations that Officer Fitch mentioned to others during his time at the burning house. Plaintiffs' Additional Undisputed Material Fact ("AMF") No. 7, Doc. 29 at 7; Doc. 30-1 at 1:44 (lapel recording in which Officer Fitch refers to Mr. Herrera as "broken" to others at scene of fire).

Officer Fitch believed that arson was a possibility, but he had no suspects. UMF No. 6; AMF No. 12. He determined that no unlawful activity was apparent, so he turned off his lapel camera and left it off for approximately two hours. AMF Nos. 8-9. During this time, he searched around the house to find Mr. Herrera and ensure that he was safe. UMF No. 7. At approximately 4:50 a.m., while standing near the south side of the small structure on Mr. Herrera's property, Officer Fitch's flashlight revealed Mr. Herrera about thirty feet away. UMF Nos. 8-10; AMF No. 15.

Officer Fitch saw that Mr. Herrera had a knife with a blade approximately three inches long. UMF No. 13. Mr. Herrera was holding the knife at his right side. UMF Nos. 9, 12. Officer

Fitch yelled something to the effect of "George, drop the knife" and drew his sidearm. UMF No.

10. Officer Fitch then repeated this order, and Mr. Herrera asked who he was. UMF No. 11.

Officer Fitch identified himself as Angel Fire Police, and Mr. Herrera asked which one. UMF

No. 11. Officer Fitch said, "Officer Fitch." *Id.* Mr. Herrera approached Officer Fitch, still

holding the knife. UMF No. 12. Although Officer Fitch had his gun pointed at Mr. Herrera, he

did not verbally warn Mr. Herrera that he would shoot Mr. Herrera if Mr. Herrera did not comply

with his commands.[2] AMF Nos. 22, 33. Officer Fitch then shot Mr. Herrera. UMF No. 16.

---

[2] Defendants offer as an undisputed fact that, after identifying himself as a police officer, Officer Fitch "then" continued to tell Mr. Herrera to stop advancing and drop the knife, but Mr. Herrera proceeded forward. UMF No. 14. Plaintiffs do not dispute this characterization of Officer Fitch's deposition testimony. Doc. 29 at 5. They assert, however, "Even if Fitch did tell George to drop the knife, there is a factual question as to whether George's failure to do so was due to willful non-compliance or because he could not see Fitch and did not understand he was law enforcement." *Id.* at 17. Whether Mr. Herrera appeared confused and, because he had a flashlight shining in his face, indicated he did not understand that the command to drop the knife was coming from a police officer, could be significant to a jury's determination of whether a reasonable officer would perceive Mr. Herrera as being hostile. Similarly, how much time Mr. Herrera had to drop the knife after Officer Fitch identified himself as a police officer could be significant to a jury. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (considering as a fact in the reasonableness determination whether a jury could find that the plaintiff "did not 'refuse' to drop the knife because he was not given sufficient time to comply"). Thus, a close review of Officer Fitch's deposition testimony is warranted.

Officer Fitch initially testified at his deposition that he ordered Mr. Herrera to drop the knife. Doc. 30-2 at 135:12-16, 146:9-12, 147:12-15. Then, Mr. Herrera asked "Who are you?" *Id.* at 137:20. Officer Fitch identified himself. *Id.* at 137:22. "And then [Mr. Herrera] began to walk towards [Officer Fitch] with the knife still in his hand." *Id.* at 139:2-3. Officer Fitch later testified, "But I didn't, again, command him to stop and drop the weapon, drop the knife." *Id.* at 153:10-11. Thus, Officer Fitch did not testify that he told Mr. Herrera to drop the knife after identifying himself as a police officer. Nor does this testimony provide evidence about how much time passed between Officer Fitch identifying himself as a police officer and his shooting Mr. Herrera. The Court, therefore, does not accept as an undisputed fact that Officer Fitch commanded Mr. Herrera to drop the knife *after* he identified himself as a police officer or that he gave Mr. Herrera sufficient time to comply with this command *after* he identified himself as a police officer. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . .").

## II.     Disputed Facts

Plaintiffs dispute whether Officer Fitch retreated and, if he did, how much. Doc. 29 at 5. They dispute how far Mr. Herrera was from Officer Fitch when Officer Fitch shot him, asserting that the distance was up to twenty feet rather than eight to twelve. *Id.* at 6. The parties disagree about the length of the knife—Plaintiffs claim it is 2.9 inches long, while Defendants assert that it is more than three inches long. Doc. 32 at 2-3.

Defendants have stated that these differences of fact are immaterial and that they are willing to adopt Plaintiffs' version of the facts for the purposes of this Motion. Doc. 32 at 2. Therefore, the Court takes these facts as true for the purposes of this analysis: (1) Officer Fitch did not retreat before using deadly force; (2) the knife was 2.9 inches long; and (3) the distance between Officer Fitch and Mr. Herrera at the time of the use of deadly force was twenty feet.

## LEGAL STANDARD

## I.     Summary Judgment

A party may prevail by summary judgment when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). The moving party has an "initial burden of production" to demonstrate this lack of dispute, and if the moving party meets this standard, "the burden shifts to the nonmoving party to demonstrate a genuine issue." *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002). "[A]n issue of material fact is genuine only if the nonmovant presents facts such that a reasonable [factfinder] could find in favor of the nonmovant." *S.E.C. v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (citation omitted). To be material, the nonmovant's showing must address an element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the court views the evidence and all reasonable

4

inferences therefrom in the light most favorable to the non-moving party. *Thompson*, 732 F.3d at 1156-57.

## II.     Qualified Immunity

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). Qualified immunity protects "officials sued in their personal capacities," as Officer Fitch has been sued in this case. *See Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1264 n.4 (10th Cir. 2009). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that 1) the officer violated a constitutional or statutory right and 2) the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez*, 563 F.3d at 1088. A court may address these prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

A law is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A Supreme Court or Tenth Circuit case on point suffices. *Becker v. Bateman*, 709 F.3d 1019, 1023 (10th Cir. 2013). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar

circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015).

## ANALYSIS

At this stage, a threshold inquiry for each of Plaintiffs' claims is whether a reasonable jury could conclude Officer Fitch acted unreasonably in using deadly force. The Court first addresses this question as it relates to Defendant Fitch's assertion of qualified immunity.

**I.** **A reasonable jury could find that Officer Fitch's actions were unreasonable under the circumstances.**

Considering the first prong of qualified immunity, Defendants argue that Officer Fitch's use of deadly force was reasonable and, therefore, he did not violate Mr. Herrera's Fourth Amendment rights. Resolving all genuine issues of material fact in Plaintiffs' favor and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that a reasonable jury could conclude otherwise.

The Fourth Amendment protects against unreasonable seizures, including the unreasonable seizure of one's person with excessive force. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). This test employs an objective standard, assessing the officer's decisions "in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 187 (1978). *Graham* considered "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" as relevant to the totality-of-the-circumstances analysis. 490 U.S. at 396 (citation omitted). The Tenth Circuit adds the "non-exhaustive factors" of "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions

6

of the suspect." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). All these factors function to guide the Court toward the ultimate question of "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.*

"Thus, at summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). Or, stated differently, to grant summary judgment to Defendants on the first prong of qualified immunity, the Court must determine that, after resolving all genuine issues of material fact in Plaintiffs' favor, no reasonable jury could draw inferences from the facts indicating that the use of force was excessive in this case. As explained below, the Court finds that a reasonable jury could find facts and inferences in Plaintiffs' favor on the question of excessive force; therefore, it must deny the request for summary judgment.

A. *Officer Fitch's testimony indicates that arson was not "at issue" in this case.*

The first *Graham* factor is the severity of the crime at issue. 490 U.S. at 396. The parties dispute whether arson was "at issue" in this case. Although Officer Fitch considered the possibility of arson, he also testified that he did not have a suspect in mind and that his efforts to search for Mr. Herrera were for the purpose of ensuring Mr. Herrera's safety. *See, e.g.*, Doc. 30-2 at 173:4-11, 219:2-4. Officer Fitch's testimony does not indicate that he intended to arrest Mr. Herrera for arson, that he had probable cause to do so, or that he even *thought* he had probable cause to do so. He recognized only the possibility of arson, had no suspect, and was not searching for Mr. Herrera with the intent to apprehend him. Thus, a reasonable jury could find in Plaintiffs' favor on this factor. *See Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) ("That

the officers were performing a welfare check, and that they were not looking for [decedent] because they suspected he had committed a crime prior to finding him, weighs heavily against the use of significant force."); *Myers v. Brewer*, 773 F. App'x 1032, 1037 (10th Cir. 2019) (no crime at issue when police received a call that decedent was standing in front of a bar with a gun); *cf. Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (factor slightly favors officer because officer believed he had probable cause to arrest suspect for assault, even though he did not).

> B. *Reasonable jurors may differ in their interpretation of the level of danger the situation posed to Officer Fitch and the firefighters.*

The second *Graham* factor is the level of immediate threat to the safety of the officer or others. 490 U.S. at 396. To understand the second *Graham* factor in more depth, courts consider the *Larsen* factors. *See, e.g.*, *Est. of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020); *Simpson v. Little*, 16 F.4th 1353, 1361 (10th Cir. 2021). The *Larsen* factors aim to "evaluat[e] the degree of threat perceived by the officer." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 765 (10th Cir. 2021). Therefore, although the parties analyzed the *Larsen* factors separately from the *Graham* factors, the Court will employ the *Larsen* factors in its analysis of the second *Graham* factor.

> 1. Although Mr. Herrera did not comply with Officer Fitch's instructions, a reasonable jury could conclude that a reasonable officer would perceive such noncompliance as the result of confusion rather than hostile defiance.

The first *Larsen* factor is whether the police ordered the suspect to drop his weapon and whether the suspect complied with those commands. 511 F.3d at 1260. Officer Fitch's lapel camera was turned off for most of the interaction between Officer Fitch and Mr. Herrera. Therefore, only Officer Fitch's deposition testimony addresses any commands Officer Fitch may have given. Officer Fitch asserts that he identified himself as law enforcement by name and that

8

he ordered Mr. Herrera to drop the knife at least three times before shooting him. Doc. 30-2 at 146:11. Plaintiffs do not dispute that Officer Fitch testified to this effect and that he is the only living witness to these encounters. Doc. 29 at 4-5.

On the other side of the balance, Plaintiffs point out that a reasonable officer should have recognized that Mr. Herrera's failure to comply could have been the product of confusion rather than aggression. Mr. Herrera had a flashlight shining in his face and he was asking for the identity of the person who was shining that flashlight. Doc. 29 at 16-17. Plus, Officer Fitch testified that he did not give a more specific command such as "drop the knife or I will shoot." Doc. 30-2 at 152:5-10. Plaintiffs argue that not all noncompliance is created equally; inability to comply is not the same as refusal to comply. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1164-65 (10th Cir. 2015) (affirming district court's finding that an officer giving insufficient time to comply did not constitute Tenorio's refusal to drop weapon). Here, Plaintiffs argue Mr. Herrera did not refuse to comply; instead, his confusion made him unable to comply.

A reasonable jury could infer that, similar to the situation in *Tenorio*, a reasonable officer would perceive Mr. Herrera's noncompliance with Officer Fitch's order to be the product of confusion rather than hostile defiance. 802 F.3d at 1164. It is undisputed for purposes of the present motion that Mr. Herrera displayed some initial confusion, with a flashlight pointed at him late at night and an unidentified person yelling at him. Officer Fitch's testimony does not establish how much time elapsed between the commands to drop the knife and the use of deadly force. His testimony also does not establish whether he gave Mr. Herrera time to comply with this order after identifying himself as a police officer, as discussed above. *Supra*, p. 3 note 2. Hence, on the current record, a reasonable jury could find that a reasonable officer in Officer Fitch's position should have realized that Mr. Herrera's noncompliance was due to Mr. Herrera

not understanding that he was confronted by a police officer giving him commands to drop his

weapon, rather than constituting a hostile refusal to comply with those commands.[3]

    2.  <u>A reasonable jury could conclude Mr. Herrera was not making any hostile motions.</u>

The second *Larsen* factor is whether the suspect made any hostile motions. 511 F.3d at

1260. The video of the shooting starts an instant before Officer Fitch fires his gun. The video

shows Mr. Herrera with his right hand next to his right thigh. He is holding something the parties

do not dispute is a knife. Thus, at the moment of the shooting, Mr. Herrera is not holding the

knife in an attacking position.

Evidence about what happened in the moments before the shooting comes from Officer

Fitch. He testified that Mr. Herrera advanced toward him notwithstanding orders to drop the

knife and that Mr. Herrera held the knife near his thigh, about a foot from his body. Doc. 30-2 at

207:18-25, 208:1-9. Defendants characterize this positioning as "holding [the knife] in a manner

that he could easily stab someone," or "a ready position," respectively. *Id.* at 207:25, 208:1; Doc.

20 at 9. Although it is true that Mr. Herrera could have quickly moved the knife from his side to

an attacking position, he did not hold the knife in the same aggressive, threatening manner as the

decedent in *Larsen*. There, the decedent "raised the knife above his shoulder with the blade

pointed outward and turned towards" an officer, then took a step toward that officer. 511 F.3d at

1258. Mr. Herrera did not move the blade from its position near his thigh, nor did he run toward

---

[3] Of course, reasonable jurors could differ in their interpretation of whether this factor favors Plaintiffs; it is undisputed that Mr. Herrera was noncompliant. Mr. Herrera was also oriented enough to ask questions of Officer Fitch, indicating that he had some understanding of what was happening. Given this and Mr. Herrera's noncompliance with Officer Fitch's repeated commands to drop the knife, a reasonable jury could conclude that a reasonable officer would perceive Mr. Herrera as simply dangerous, not confused. Or, a reasonable jury could conclude that a reasonable officer would perceive Mr. Herrera as confused *and* dangerous. After all, confusion and danger are not mutually exclusive. Because reasonable jurors could draw different interpretations from the evidence, summary judgment is not proper.

Officer Fitch or act erratically. Doc. 30-2 at 139:2-8, 147:16-19, 152:13-18. Simply advancing

with a blade held at one's side is not necessarily a hostile motion. *See Tenorio*, 802 F.3d at 1166;

*Zuchel v. City & Cnty. of Denver, Colo.*, 997 F.2d 730, 736 (10th Cir. 1993). Thus, viewing the

facts in the light most favorable to Plaintiffs, this factor weighs in Plaintiffs' favor.

3.   A reasonable jury could conclude that the distance between Mr. Herrera and Officer
     Fitch did not justify the use of deadly force.

The third *Larsen* factor is the distance separating the officers and the suspect. 511 F.3d at

1260. Defendants assert that Mr. Herrera had narrowed the distance between himself and Officer

Fitch to eight or ten feet before the shooting. Doc. 30-2, 139:1-3, 144:8-13. Nonetheless,

acknowledging that all reasonable factual inferences must be drawn in Plaintiffs' favor at this

point, Defendants concede for purposes of the present motion that the distance between Mr.

Herrera and Officer Fitch was as much as twenty feet. Doc. 32 at 2-3 (Defendants accept

Plaintiffs' facts as true for the purposes of this motion only); Doc. 29 at 18; Doc. 30-13. On the

facts presented in this motion and drawing all reasonable inferences in favor of Plaintiffs, it is

not reasonably possible that Mr. Herrera could have seriously harmed Officer Fitch with the

knife he was carrying from a distance of twenty feet. Nonetheless, because a knife wielder can

often quickly close a twenty-foot distance, this distance has been found to support an officer's

use of deadly force when combined with other circumstances. *Larsen*, 511 F.3d at 1261-62.

*Larsen* relied on the officers' use of force training manual in Denver, which stated that a person

wielding a knife was an imminent threat within twenty-one feet of an officer. *Id.* at 1261 n.1. The

parties cite to no equivalent reference for officer safety in New Mexico, but there is no reason to

think that knife safety would differ significantly from one location to another.

That being said, an officer's knowledge that a knife wielder has a physical disability that

would impair his ability to close the 20-foot gap quickly is relevant. Here, although no evidence

exists that Mr. Herrera had an obvious physical disability, Officer Fitch knew Mr. Herrera had

lingering physical disabilities after an on-the-job explosion. Earlier in the night, he had

speculated that these injuries would have prevented Mr. Herrera from being able to get into the

back of a pickup. *See* Doc. 29 at 14; Doc. 30-1 at 1:45; Doc. 30-2 at 106:21-25, 107:1. A

reasonable jury could conclude that Officer Fitch's awareness of Mr. Herrera's physical

disability is a relevant factor and that a reasonable officer in his position should have considered

this disability in assessing whether lethal force was necessary.[4] In sum, although Mr. Herrera

was close enough to Officer Fitch that a jury could reasonably conclude deadly force was

necessary, the distance is not so close, and Mr. Herrera's ability to close the distance quickly is

not so obvious, that this factor would prevent a reasonable jury from concluding that Officer

Fitch's use of deadly force violated Mr. Herrera's Fourth Amendment rights.

   4.   Drawing all inferences in Plaintiffs' favor, a reasonable jury could conclude that Mr.
        Herrera did not manifest an intent to harm Officer Fitch.

   The fourth *Larsen* factor is the manifest intentions of the suspect. 511 F.3d at 1260.

Defendants cite Mr. Herrera's "actions in continuing to move closer to Defendant Fitch, even

when the defendant told him to drop the knife and even though the defendant was retreating," as

manifesting an intention to harm Officer Fitch. Doc. 20 at 10. Plaintiffs again counter (as they

did in response to the first *Larsen* factor—failure to comply with instructions) that Mr. Herrera

may have been disoriented or confused given the late hour, the stressful circumstances of his

---

[4] Despite Officer Fitch's knowledge of Mr. Herrera's physical disability, however, a reasonable
jury could conclude that, in the heat of the moment, it was reasonable that Officer Fitch would
not be thinking about Mr. Herrera's non-apparent physical disability. *See Graham*, 490 U.S. at
396 ("The reasonableness of a particular use of force must be judged from the perspective of a
reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (internal
quotation omitted)). Again, the fact that reasonable jurors could differ indicates this is an issue
for trial.

home burning down, and the flashlight shining in his eyes and possibly blinding him to Officer

Fitch's features or firearm. Doc. 29 at 19. The Court agrees with Plaintiffs that simply moving

forward while holding a blade at one's side does not automatically establish hostility as a matter

of law. *See Tenorio*, 802 F.3d at 1166; *Zuchel*, 997 F.2d at 736. The Court also agrees that, in

assessing a person's intentions (whether the person presents a threat), the officer must consider

the totality of the circumstances, including whether that person merely might be confused. Here,

considering the facts in the light most favorable to Plaintiffs, Mr. Herrera simply advanced while

holding a blade at his side, which is not necessarily a manifestation of hostility. Therefore, a

reasonable jury interpreting the facts as Plaintiffs have portrayed them could find in favor of

Plaintiffs on this factor.[5]

5. <u>A reasonable jury could conclude that Mr. Herrera did not pose a danger to the firefighters.</u>

In addition to the *Larsen* factors, the second *Graham* factor allows for consideration of

threats to the safety of others—not just the officer at issue. *See Graham*, 490 U.S. at 396 (factor

is "whether the suspect poses an immediate threat to the safety of the officer *or others*"

(emphasis added)). Here, Defendants note that the unarmed firefighters in the vicinity of the

shooting were potential victims if Mr. Herrera used his knife against them. Doc. 20 at 9. Officer

Fitch testified that the nearest firefighter was twenty or twenty-five feet from Mr. Herrera at the

---

[5] A reasonable jury could also reach the opposite conclusion. In this moment, Officer Fitch was faced with a fire of unknown origin, Mr. Herrera's mysterious absence for two hours, Mr. Herrera's unexpected emergence from a small structure in the woods in the middle of the night, Mr. Herrera's possession of a knife, and Mr. Herrera's continuing advancement toward Officer Fitch even after Officer Fitch had identified himself as a police officer and told Mr. Herrera to drop the knife. In these circumstances, a reasonable jury could conclude a reasonable officer would perceive Mr. Herrera as intending to do harm.

time Officer Fitch shot him, Doc. 30-2 at 169:2-4, and that Mr. Herrera could have moved to his right to side-step Officer Fitch and get to the firefighters, *id.* at 168:13-18.

Because the distance between Mr. Herrera and the firefighters was approximately the same as the distance between Mr. Herrera and Officer Fitch, much of the analysis of the third *Larsen* factor (distance between Mr. Herrera and Officer Fitch) applies. As noted above, *Larsen* indicated that twenty-one feet of distance was the threshold for immediate danger from a person wielding a knife. 511 F.3d at 1261 n.1. This distance, however, must be considered along with other factors. Also as noted above, one of these additional factors is Officer Fitch's knowledge that Mr. Herrera had some physical disabilities.

More important than these already-analyzed factors, however, is that Defendants provide no evidence that Mr. Herrera made any threatening motion, gesture, comment, or movement toward any firefighter. Rather, the opposite is true. Officer Fitch's testimony indicates that Mr. Herrera's focus was on Officer Fitch. *See* Doc. 30-2 at 147:16-25, 148:1-13 (Mr. Herrera was "calm" and "deliberate" and responded to Officer Fitch's statement identifying himself as Angel Fire Police in a way that made Officer Fitch believe Mr. Herrera understood him). No evidence exists that Mr. Herrera, who presumably had ample opportunity to attack a firefighter before Office Fitch discovered him, would divert his attention from Officer Fitch and suddenly move to attack a firefighter. Although such unexpected action is possible, drawing all inferences in favor of Plaintiffs, a reasonable officer would not believe that Mr. Herrera, who was focused on Officer Fitch, walking toward Officer Fitch, and calmly carrying a knife at his side, needed to be shot to protect the firefighters.

C. *Mr. Herrera was not resisting or evading arrest.*

The third *Graham* factor is whether the victim was resisting or evading arrest. 490 U.S. at 396. Defendants contend that Mr. Herrera was "clearly resisting possible arrest by threatening Defendant Fitch with a knife, refusing to drop the knife upon Defendant's warning." Doc. 20 at 9. However, as Plaintiffs argue, Mr. Herrera was not under arrest and no probable cause existed that he had committed a crime. *See* Doc. 29 at 15. Because Mr. Herrera was not resisting or evading arrest, this factor weighs in Plaintiffs' favor.[6]

D. *Relevant Tenth Circuit precedent in* Tenorio v. Pitzer, *802 F.3d 1160 (10th Cir. 2015), suggests that, in the situation that exists when all reasonable inferences are drawn in Plaintiffs' favor, deadly force was unreasonable.*

In addition to considering the *Graham and Larsen* factors, whether it was reasonable for Officer Fitch to use deadly force in response to the threat Mr. Herrera posed must be considered with reference to binding Tenth Circuit precedent.

In *Tenorio*, officers responded to a 911 call indicating that Tenorio was intoxicated and holding a knife to his own throat. 802 F.3d at 1161-62. The caller was concerned that Tenorio would hurt himself or his wife, and he indicated that Tenorio had been violent in the past. *Id.* at 1162. The officers arrived on the scene, one announced that he was "going lethal," and they entered through the open front door and ordered the house's occupants to step out of the kitchen with their hands up. *Id.* Tenorio emerged with a blank stare, holding a three-and-a-quarter-inch kitchen knife loosely in his right hand with his arm by his side. *Id.* at 1163. He walked at an average speed toward the officers, out of the kitchen and into the living room. *Id.* The officers

---

[6] The Court recognizes that when Mr. Herrera came out of the woods holding a knife he might have been a threat regardless of whether Officer Fitch intended to arrest him. But this possible threat is not appropriately weighed as part of the third *Graham* factor. *Estate of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020) (because someone ready to attack an officer is ready to resist arrest, resisting arrest factor is insignificant and court's attention is best spent on immediate threat factor instead).

shouted at him to put the knife down, and when Tenorio was about two and one-half steps into the living room, an officer shot him. *Id.* The commands and the shooting lasted two or three seconds. *Id.*

The Tenth Circuit recognized that some facts supported the use of deadly force: "The officers were responding to an emergency call for police assistance to protect against danger from a man who had been violent in the past and was waving a knife around in his home. The man was walking toward [the police officer] in a moderate-sized room while still carrying the knife despite repeated orders to drop it." *Id.* at 1164. However, "the district court ruled that the record supports some potential jury findings that would establish Tenorio's claim": (1) Tenorio did not refuse to comply with the command to drop the knife but was instead given insufficient time to do so; (2) Tenorio made no hostile motions towards the officers or anyone else and merely held the knife loosely by his thigh; (3) Tenorio was shot before he was within "striking distance" of the officers; and (4) for all the officers knew, Tenorio was a threat only to himself. *Id.* at 1164-65.

The majority felt "comfortable that the evidence, viewed in this light, suffices for Tenorio's claims." *Id.* at 1165. "In fact," the majority continued, "our precedents compel this result." *Id.* The majority then discussed two prior cases that clearly established principles of law regarding suspects wielding knives. *Id.* at 1165-66. Importantly, the core of the present case—Mr. Herrera's actions with the knife—tracks closely with the discussion of clearly established law in *Tenorio*:

> where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, . . . it was unreasonable for the officer to use deadly force against the suspect.

*Id*. at 1165-66 (citing *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) as binding on its own facts as recently as 2015). Like the knife-wielder in *Tenorio*, Mr. Herrera was only holding a knife and Officer Fitch had no reason to believe he was carrying a gun. Mr. Herrera did not charge Officer Fitch, made no slicing or stabbing motions with the knife he was carrying, and was not within striking distance at the time of the shooting. Moreover, unlike in *Tenorio*, Officer Fitch had no information that Mr. Herrera had been violent in the past and was not called to the scene by someone concerned about Mr. Herrera being a danger to others. Therefore, Officer Fitch was arguably in a less dangerous situation than were the officers in *Tenorio*.

Of course, the two factors of "charging" and "making slicing or stabbing motions" are not the only way a suspect can manifest hostility, as *Tenorio* acknowledged. This quote from *Walker* is not always the end of the story. *Id.* at 1166 (recognizing that *Estate of Larsen*, 511 F.3d 1255, distinguished this rule where the knife was "raised in a provocative motion"). The Court further does not interpret *Tenorio* as holding that where a suspect is carrying only a knife, not charging, and not holding the knife in a threatening manner, deadly force is per se unreasonable, *regardless of whatever other facts might exist*.[7] As discussed above, Defendants argue that certain facts here indicate that a reasonable officer could perceive Mr. Herrera's actions as hostile. Just as in *Tenorio*, there are some facts on one side of the scale and some facts on the other. 802 F.3d at 1164-65. Importantly, however, a reasonable jury could find that Mr. Herrera was noncompliant solely due to confusion, which would have been apparent to a reasonable officer; that he was evincing no hostility through gestures or otherwise; that he was outside "striking distance"; that he was not charging the officer; and that he was not a danger.

---

[7] Suppose, for instance, the knife-wielder, although holding the knife at his side, had arms flexed, looked extremely agitated and was simultaneously yelling in profane language that he intended to plunge his knife into the officer's heart.

Thus, under Tenth Circuit precedent, the Court must conclude that a reasonable jury could find that Officer Fitch's use of deadly force was unconstitutional. Notably—just as in *Tenorio*— "because [this] review is predicated on the [C]ourt's assessment of the evidence in the light most favorable to Tenorio, a contrary judgment may be permissible after a trial to a jury." *Id.* at 1166.

E. The Graham *factors*, Larsen *factors, and factual similarities to* Tenorio *preclude summary judgment on the reasonableness issue.*

Balancing the *Graham* and *Larsen* factors, considering the similarity between *Tenorio* and the present case, and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that a reasonable jury may look at the facts before it and find in Plaintiffs' favor regarding the severity of the crime at issue, the nuances of the threat Mr. Herrera posed to Officer Fitch, and the ultimate question of whether it was reasonable for Officer Fitch to use lethal force against Mr. Herrera.

## II. ***Tenorio* provides clearly established law governing Officer Fitch's conduct when all genuine issues of material fact are resolved in Plaintiffs' favor and all reasonable inferences are drawn in Plaintiffs' favor.**

Moving to the next prong of qualified immunity, the plaintiff must show that the constitutional right violated by the officer was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez*, 563 F.3d at 1088. That is, although the Court finds that a reasonable jury, drawing all reasonable factual inferences in favor of Plaintiffs, could find that Officer Fitch's actions were unreasonable under the circumstances, Plaintiffs must still demonstrate that the law was clearly established to avoid summary judgment against them.

Plaintiffs contend that *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015), provides the clearly established law governing this case. The Supreme Court in recent years has reminded lower courts "not to define clearly established law at a high level of generality." *Kisela v.*

*Hughes*, 138 S. Ct. 1148, 1152 (2018);[8] *see also City of Tahlequah, Oklahoma v. Bond*, 142 S.

Ct. 9, 11 (2021). Thus, the facts in *Tenorio* must closely align with the facts of the present case,

or *Tenorio* cannot establish that "any reasonable official in the defendant's shoes would have

understood that he was violating" the constitution. *Kisela*, 138 S. Ct. at 1153. As the Court

already determined, *Tenorio* governs this case because a reasonable jury could find that Mr.

Herrera was noncompliant solely due to lack of opportunity or ability to comply; that he was

evincing no hostility through gestures or otherwise; that he was outside "striking distance"; that

he was not charging the officer; and that he held a knife only loosely at his side making no

slicing or stabbing motions. These findings would place Officer Fitch's actions squarely within

*Tenorio* and, therefore, *Tenorio* clearly establishes such conduct as unconstitutional. *See* 802

F.3d at 1165-66 (finding the law on this point clearly established).

 Defendants' citation to the Supreme Court's decision in *Bond* does not dictate a different

result. There, a woman called the police, explaining that her ex-husband was intoxicated and

would not leave her garage. 142 S. Ct. at 10. When officers arrived, they went to the side

entrance of the garage and began speaking with the ex-husband in the doorway. *Id.* After the ex-

husband refused a pat down, one officer stepped toward the ex-husband, causing the ex-husband

to take one step back. *Id.* The ex-husband then turned around and walked to the back of the

garage, with the officers following behind. *Id.* The ex-husband grabbed a hammer from the back

wall and turned around to face the officers. *Id.* No officer was within six feet of the ex-husband.

*Id.* The ex-husband grasped the hammer with both hands, as if preparing to swing, and pulled the

---

[8] *Kisela* also involved an officer shooting of a knife-wielding decedent. The Supreme Court
reversed the Ninth Circuit's denial of qualified immunity. Defendants do not cite to *Kisela*, so
the Court does not analyze it except to note that *Kisela* does not overturn *Tenorio* and therefore
would not change the outcome of the current decision.

hammer to shoulder level. *Id.* The officers backed up, drawing their guns, and yelled to drop the hammer. *Id.* The ex-husband did not, but instead took a few steps to his right, coming out from behind a piece of furniture with an unobstructed path to one officer. *Id.* He raised the hammer higher and took a stance as if to throw it; in response two officers fired, killing him. *Id.* Finding a lack of clearly established law, the Supreme Court reversed the Tenth Circuit's decision to deny qualified immunity to the police officer.

Because the Supreme Court did not address the first qualified immunity prong—whether the officer's conduct was constitutional—*Bond* provides little guidance on that question. In addition, unlike the situation in *Bond* where the ex-husband held a hammer like a baseball bat and raised it as if he was going to throw it, Mr. Herrera held a knife down at his side and made no stabbing or slashing motions.

The greater relevance of *Bond* is found in its admonition to lower courts regarding the second qualified immunity prong. The Supreme Court stated:

> We have repeatedly told courts not to define clearly established law at too high a level of generality. *See*, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12, (2015) (per curiam) (internal quotation marks omitted).

*Id.* at 11-12 (citation styles altered). This admonition lends support to Judge Phillips' dissenting argument that the *Tenorio* majority spoke too generally when it held that a police officer is not entitled to summary judgment when a knife-wielder advances on, but does not charge, a police

officer and makes no slashing or stabbing motions with the knife.[9] Nonetheless, *Tenorio* remains the law in the Tenth Circuit and it is for the Tenth Circuit, not this court, to depart from its own precedents in light of Supreme Court decisions. Every reasonable officer is deemed to have notice of published Tenth Circuit cases regarding the unconstitutional use of deadly force. *See Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (ordinarily a right is "clearly established" when there is a Supreme Court or Tenth Circuit decision on point (citation omitted)). As a result, qualified immunity does not attach to Officer Fitch's actions when drawing all reasonable inferences in Plaintiffs' favor.

### III.   Plaintiffs' other claims rely on a reasonableness standard and a reasonable jury could determine that Officer Fitch acted unreasonably, so summary judgment is inappropriate to resolve those claims.

Plaintiffs' other claims also rely on a reasonableness standard. Because, resolving all genuine issues of material fact in Plaintiffs' favor and drawing all reasonable inferences in Plaintiffs' favor, a reasonable jury could find Officer Fitch's use of deadly force to be unreasonable, Defendants' motion regarding these other claims also fails. *See Pena v. Greffet*, 922 F. Supp. 2d 1187, 1251 (D.N.M. 2013) (officer liability for battery under New Mexico law depends "whether the use of force was reasonable under the circumstances"); *McDermitt v. Corr.*

---

[9] Notably, many of the arguments Defendants make in support of their motion for summary judgment are similar to arguments the dissent in *Tenorio* made, but that did not carry the day. In his dissent, Judge Phillips criticizes the majority's holding as focusing on only two factors: (1) whether the person shot was charging the officers as opposed to simply advancing toward the officers, and (2) whether that person was making threatening gestures with the knife as opposed to just holding the knife. 802 F.3d at 1170 (Phillips, J., dissenting). He stated, "As I understand the majority's new approach, Tenorio was free to get right up to the officers so long as he did not 'charge' them while making stabbing or slashing motions with the knife." *Id.* He further described the majority's decision as a "quick knockout punch to qualified immunity [that] absent charging, slashing, and stabbing precludes officers from firing shots even when a knife-wielding man gets within, or extremely close to, stabbing range so long as he gets there by walking (not charging) and has positioned his knife for a quick thrust (without the fanfare of menacingly waving it before striking)." *Id.*

*Corp. of Am.*, 1991-NMCA-034, ¶¶ 1, 6, 112 N.M. 247 (immunity for negligent training and supervision is not waived without commission of a tort covered under the New Mexico Tort Claims Act "or a deprivation of a right secured by the federal or state constitution or laws"); *Sanchez v. Baker*, 457 F. Supp. 3d 1143, 1160 (D.N.M. 2020) (reasonableness standard for New Mexico Constitution excessive force claims); NMSA § 41-4-12 (no sovereign immunity against wrongful death claims *resulting from* enumerated legal violation).[10]

Because a reasonable jury could determine that Officer Fitch acted unreasonably in violation of the Fourth Amendment's protections, summary judgment is not an appropriate vehicle through which to resolve these claims. Accordingly, Defendants' Motion is **DENIED** in its entirety.

**IT IS SO ORDERED.**

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

---

[10] Here, the enumerated legal violation could be a violation of the Fourth Amendment to the United States Constitution, a violation of the New Mexico Constitution, or battery.

22