## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GEORGE JOSHUA HERRERA and
CRYSTAL HERRERA SENA, as
co-personal representative of the WRONGFUL
DEATH ESTATE OF GEORGE HERRERA,

     Plaintiffs,

v.                            No. 1:21-cv-465-SCY-LF

THE VILLAGE OF ANGEL FIRE
and MARK FITCH, in his individual
capacity,

     Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT[1]

In a June 28, 2022 Opinion, the Court denied Defendants' motion for summary judgment, including Officer Mark Fitch's assertion of qualified immunity. Doc. 40. Specifically, the Court held that a reasonable jury could determine that Officer Fitch acted unreasonably when he shot George Herrera and that Tenth Circuit precedent existed to place Officer Fitch on notice that his actions (drawing all factual inferences in favor of Plaintiffs) were unconstitutional. *Id.* Defendants have now filed a renewed motion for summary judgment as to certain claims in Plaintiffs' operative complaint, to include a reassertion of qualified immunity for Officer Fitch. Doc. 129.

In the renewed motion for qualified immunity, Defendants withdraw some previous factual concessions and present new facts. Almost all of the "new" facts Defendants present were

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Doc. 12.

in Defendants' possession, or available to Defendants, at the time they filed their first motion for summary judgment. As such, the Court views Defendants' renewed motion for summary judgment as a motion to reconsider. Accordingly, before addressing the merits of Defendants' motion, the Court must first consider what standard to apply to the request to reconsider.

Ultimately, the Court concludes that, to prevent manifest injustice, it must take a fresh look at Officer Fitch's qualified immunity assertion. This is because, when opposing Defendants' first motion for summary judgment, Plaintiffs presented, and the Court relied on, deposition testimony from Officer Fitch that Officer Fitch had timely corrected. Because the Court did not have Officer Fitch's corrected deposition testimony before it at the time it issued its previous Opinion, manifest injustice would occur if it did not reevaluate Officer Fitch's qualified immunity assertion as informed by Officer Fitch's timely corrected deposition transcript. And, because the Court is already taking a fresh look at Officer Fitch's qualified immunity motion in light of his corrected deposition testimony, the Court further finds that it promotes the interests of justice to consider all evidence and arguments relevant to the merits of Officer Fitch's assertion of qualified immunity motion, even if some evidence and arguments could have been presented with the original motion for summary judgment.

Turning to the merits of Defendants' motion, the Court concludes that the new information Defendants present compels a different outcome as to Officer Fitch's assertion of qualified immunity. Drawing all factual inferences in Plaintiffs' favor, no reasonable jury could conclude that Officer Fitch acted unreasonably when he shot George Herrera. Additionally, no clearly established law would have put a reasonable officer on notice that, under the new facts the parties present, the use of lethal force would be unreasonable. The Court therefore grants in part Defendants' Renewed Motion for Summary Judgment (Doc. 129) as to Plaintiffs' Fourth

Amendment claim against Officer Fitch. Because the Court finds no underlying constitutional violation, it is also inclined to grant summary judgment as to Plaintiffs' Fourth Amendment claim against the Village of Angel Fire. Under Rule 56(f), however, the Court gives the parties notice of this intent and an opportunity to respond. Lastly, the Court takes under advisement the renewed motion for summary judgment as to Plaintiffs' state-law claims and takes under advisement whether it should decline to exercise supplemental jurisdiction over the state-law claims.

## PROCEDURAL BACKGROUND

Defendants filed their first motion for summary judgment on September 3, 2021. Doc. 20. In deciding that motion, the Court noted that "Defendants have stated that [several] differences of fact are immaterial and that they are willing to adopt Plaintiffs' version of the facts for the purposes of this Motion." Doc. 40 at 4. Therefore, the Court took "these facts as true for the purposes of [its] analysis: (1) Officer Fitch did not retreat before using deadly force; (2) the knife was 2.9 inches long; and (3) the distance between Officer Fitch and Mr. Herrera at the time of the use of deadly force was twenty feet." *Id.* Evidence before the Court at the time of the first motion further indicated that, after having identified himself as a police officer, Officer Fitch never commanded Mr. Herrera to drop the knife or to stop advancing. *Id.* at 2-3. And, there was no evidence about how much time transpired between Officer Fitch identifying himself as a police officer and his shooting Mr. Herrera. *Id.* at 3 n.2. Based on the stipulations, and the other undisputed facts, the Court summarized the undisputed material facts as follows:

> Defendant Mark Fitch, an officer with the Village of Angel Fire Police Department, received a call in the early morning hours of May 5, 2019, alerting him to a house on fire and a sighting of a male walking into the woods. Defendants' Undisputed Material Fact ("UMF") No. 1, Doc. 20 at 2. He went to the house and learned that Mr. George Herrera lived there. UMF No. 2. Officer Fitch knew Mr. Herrera from a previous DWI investigation and court date.

3

Plaintiffs' Response to Defendants' Statement of Fact No. 3, Doc. 29 at 2. Over the course of those previous interactions, Officer Fitch had learned that Mr. Herrera "had had a broken back and had previously been in an oil rig explosion," which led to ongoing mobility limitations that Officer Fitch mentioned to others during his time at the burning house. Plaintiffs' Additional Undisputed Material Fact ("AMF") No. 7, Doc. 29 at 7; Doc. 30-1 at 1:44 (lapel recording in which Officer Fitch refers to Mr. Herrera as "broken" to others at scene of fire).

Officer Fitch believed that arson was a possibility, but he had no suspects. UMF No. 6; AMF No. 12. He determined that no unlawful activity was apparent, so he turned off his lapel camera and left it off for approximately two hours. AMF Nos. 8-9. During this time, he searched around the house to find Mr. Herrera and ensure that he was safe. UMF No. 7. At approximately 4:50 a.m., while standing near the south side of the small structure on Mr. Herrera's property, Officer Fitch's flashlight revealed Mr. Herrera about thirty feet away. UMF Nos. 8-10; AMF No. 15.

Officer Fitch saw that Mr. Herrera had a knife with a blade approximately three inches long. UMF No. 13. Mr. Herrera was holding the knife at his right side. UMF Nos. 9, 12. Officer Fitch yelled something to the effect of "George, drop the knife" and drew his sidearm. UMF No. 10. Officer Fitch then repeated this order, and Mr. Herrera asked who he was. UMF No. 11. Officer Fitch identified himself as Angel Fire Police, and Mr. Herrera asked which one. UMF No. 11. Officer Fitch said, "Officer Fitch." *Id.* Mr. Herrera approached Officer Fitch, still holding the knife. UMF No. 12. Although Officer Fitch had his gun pointed at Mr. Herrera, he did not verbally warn Mr. Herrera that he would shoot Mr. Herrera if Mr. Herrera did not comply with his commands. AMF Nos. 22, 33. Officer Fitch then shot Mr. Herrera. UMF No. 16.

Doc. 40 at 2-3 (footnote omitted).

Drawing all inferences in favor of Plaintiffs, the Court found that a reasonable jury could conclude that Officer Fitch, upon seeing Mr. Herrera, shined a flashlight in his face and yelled at him to drop his knife. Mr. Herrera, who was confused and walking toward Officer Fitch with a knife at his side and a light shining in his face, asked Officer Fitch to identify himself. *Id.* at 9. Almost immediately after Officer Fitch did so, and without further warning, Officer Fitch then shot and killed Mr. Herrera. *Id.* Any reasonable officer, the Court concluded, would understand that shooting Mr. Herrera in these circumstances would violate Mr. Herrera's constitutional rights. *Id.* at 21.

Defendants filed a renewed motion for summary judgment on July 10, 2023. Doc. 129, 136;[2] *see also* Doc. 150 (response); Doc. 157 (reply). In this present, renewed motion for summary judgment, Defendants no longer concede that the three above-enumerated facts (related to retreating, length of knife, and distance apart at time of shooting) are immaterial. The Court agrees that whether Officer Fitch retreated before using deadly force and whether the distance between Officer Fitch and Mr. Herrera was less than twenty feet when Officer Fitch shot Mr. Herrera are material. Defendants also assert, for the first time, that a portion of Officer Fitch's deposition transcript which Plaintiffs submitted, and that the Court relied on, was inaccurate. Doc. 157 at 4. Specifically, the Court quoted Officer Fitch as testifying that, after identifying himself as a police officer, he "didn't, again, command [Mr. Herrera] to stop and drop the weapon, drop the knife." Doc. 40 at 3 n.2 (quoting Doc. 30-2 at 153:10-11.). On June 8, 2021, however, Officer Fitch timely submitted a correction to his deposition, asserting he testified "I did" rather than "I didn't" command Mr. Herrera to drop the knife after Officer Fitch identified himself as a police officer. Doc. 136-2 at 1-2, 5. Lastly, Defendants submit new evidence, in the form of declarations and an affidavit from Officer Fitch and two EMTs on the scene, as well as deposition testimony from one firefighter, related to how many times Officer Fitch commanded Mr. Herrera to stop and drop the knife after he identified himself as a police officer and how much time transpired between Officer Fitch's commands and Officer Fitch shooting Mr. Herrera. Docs. 136-2, 136-7, 136-8, 136-9. In response to the renewed motion for summary judgment,

---

[2] Along with the renewed motion for summary judgment (Doc. 129), Defendants filed a memorandum in support of summary judgment and included 77 pages of exhibits. Doc. 131. After the Court denied Defendants' open-ended request for a page extension, Doc. 134, Defendants filed their first amended memorandum in support of summary judgment, with only 53 pages of exhibits. Doc. 136. Thus, when discussing Defendants' renewed motion for summary judgment and their arguments and evidence for summary judgment, the Court cites to docket entry 136—Defendants' first amended memorandum in support of summary judgment.

Plaintiffs do not specifically dispute Defendants' statement of facts or attach any exhibits; instead, they adopt by reference their response, and accompanying exhibits, to the prior motion for summary judgment. Doc. 150 at 7 (citing Doc. 29).

The Court held a hearing on December 6, 2023 on the renewed motion for summary judgment. At this hearing, Defendants pressed their argument that undisputed evidence demonstrates Officer Fitch identified himself as a police officer and that, after doing so, Officer Fitch warned Mr. Herrera to drop his knife. *See* Doc. 166. In response, Plaintiffs identified several witnesses they assert will provide contrary testimony. Because Plaintiffs had not previously submitted evidence of these witnesses' testimony, Plaintiffs orally moved to supplement their response. The Court granted this motion over Defendants' objection, reasoning that it would be unfair to allow Defendants to present evidence in their second motion for summary judgment that they could have presented in the first motion (e.g., Officer Fitch's declaration) but bar Plaintiffs from presenting evidence they did not initially present in their response to Defendants' renewed motion for summary judgment. Plaintiffs then supplemented the record by presenting the unsworn declaration of Eagle Nest Volunteer Fire Department Chief Scott Gibson, an affidavit of John W. Murtagh of the Angel Fire Fire Department,[3] the deposition testimony of Angel Fire Fire Department Assistant Chief Craig Sime, and the deposition testimony of fireman Tucker Cottam.[4] Docs. 169-1 to 196-4. Defendants also supplemented the record with additional declarations executed by Mr. Murtagh and Mr. Gibson, and additional excerpts of the depositions given by Mr. Sime and Mr. Cottam. Doc. 169.

---

[3] John W. Murtagh is the son of Angel Fire Fire Department Chief John Francis Murtagh, another witness in this case. Doc. 168 at 2 n.1.

[4] Plaintiffs do not state which fire department Mr. Cottam worked for but this information is immaterial to the Court's analysis.

6

## SUCCESSIVE MOTIONS FOR SUMMARY JUDGMENT

Before conducting a more in-depth analysis of the evidence presented, the Court addresses the threshold question of whether Defendants, having already filed a motion for summary judgment, should get another bite at the apple. Plaintiffs assert, "The Tenth Circuit has articulated the three requirements for granting reconsideration: 'an intervening change in the controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice.'" Doc. 150 at 3 (citing *Servants of Paraclete*, 204 F.3d at 1012; *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995)). Defendants, Plaintiffs argue, fail to meet any of these requirements. In their reply, Defendants counter that *Servants of Paraclete* is not applicable here because it "involved an appeal of a district court's denial of two post-judgment Rule 60(b) motions . . . . That is not the circumstance here, where no final judgment has been entered." Doc. 157 at 3. Defendants argue "that the Court has the general discretionary authority to review its prior, interlocutory Order regarding Defendants' motion for summary judgment on the grounds of qualified immunity, and it is not bound by the stricter standards for a Rule 60(b) motion." *Id.* Although the parties disagree about whether the Court should consider any of the new evidence Defendants present, they agree that the decision about what to consider is in the Court's discretion. Doc. 157 at 3 (Defendants' reply noting that "the Court has the general discretionary authority to review its prior, interlocutory Order regarding Defendants' motion for summary judgment on the grounds of qualified immunity, and it is not bound by the stricter standards for a Rule 60(b) motion"); Doc. 150 at 3 (Plaintiffs' response, stating that "[w]hen a party seeks reconsideration of a non-final order, the motion is considered an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment") (internal quotation marks omitted).

Here, Defendants are not asking the Court to reconsider a final judgment under Rule 59(e) or 60(b), but an interlocutory order entered while the case is still proceeding toward a final judgment. In such a circumstance, the Court has discretion to reopen "every order short of a final decree." *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005); *see also* Federal Rule of Civil Procedure 54(b) ("[A]ny order or other decision, however designated that adjudicates fewer than all the claims or the rights and liability of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). In reviewing an interlocutory order, the court is not required to apply the standards of Rule 59(e) and Rule 60(b). *Fye v. Oklahoma Corp. Com'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008); *Trujillo v. Bd. of Educ. of Albuquerque Public Schs.*, 212 Fed. App'x 760, 765 (10th Cir. 2007). However, the Tenth Circuit has indicated that a district court faced with a Rule 54(b) motion to reconsider may use the standards for reviewing a motion to alter or amend a judgment under Rule 59(e) to guide its analysis. *Ankeney v. Zavaras*, 524 F. App'x 454, 458 (10th Cir. 2013).[5] Under the Rule 59(e) standards, a court may grant a motion for reconsideration in three circumstances: when there is "an intervening change in the controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995). A motion to reconsider is not an opportunity "to revisit issues already addressed or advance arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).

---

[5] The Court cites unpublished Tenth Circuit cases for their persuasive value. *See* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

8

Looking to those factors, the Court agrees with Plaintiffs that there has been no change in controlling law. The Court further agrees with Plaintiffs that much of the "new" evidence and argument Defendants present could have been presented in Defendants' previous motion for summary judgment. For instance, in the present motion Defendants provide a declaration in which Officer Fitch states he attempted to back away from Mr. Herrera before shooting him, was eight to ten feet from Mr. Herrera when he shot him, and between twenty to twenty-five seconds likely transpired between his seeing and his shooting Mr. Herrera. Doc. 136-2 at 3. Defendants, however, could have presented this evidence, and arguments related to this evidence, when they filed their first motion for summary judgment. Similarly, Defendants present declarations and affidavits from a fireman and EMTs who were on the scene at that time of the shooting. Defendants were aware of these witnesses from the time of the shooting and they presumably could have obtained the same statements from these witnesses before they filed their first motion for summary judgment.

Although Defendants cannot credibly argue this evidence was unavailable when they filed their first motion for summary judgment, they do correctly note that Officer Fitch can raise qualified immunity at any time. Doc. 157 at 4. But the ability to choose when to raise a pre-trial qualified immunity motion is different than an ability to bring successive pre-trial qualified immunity motions based on argument or evidence that could have been, but was not, previously presented. The Court recognizes that qualified immunity is intended to provide immunity from suit, which is effectively lost if a court erroneously permits a case to go to trial. But if a defendant does not present evidence and arguments sufficient to justify the grant of qualified immunity, to the extent there is error, the error is in the initial failure to present evidence and arguments sufficient to justify the application of qualified immunity, not in the Court allowing

the case to go forward in the absence of such evidence and argument. The Court is aware of no obligation to consider, in the context of a second pre-trial Rule 56 motion, evidence and argument that could have been presented in the first Rule 56 motion.

When a defendant presents evidence and argument in a successive Rule 56 pre-trial motion that supports the granting of qualified immunity, however, the Court faces a dilemma. On the one hand, myriad reasons exist to encourage parties to present all evidence and information available at the time they file their initial Rule 56 motion. Considering a second Rule 56 pre-trial motion that is based on evidence and arguments previously available enables behavior at odds with judicial efficiency. On the other hand, allowing a case to proceed to trial when evidence and arguments sufficient to support qualified immunity exist—although belatedly presented—runs contrary to the intent of qualified immunity and wastes the resources of the parties, the Court, and the public. The Court must resolve this dilemma on a case-by-case basis.

In the present case, the assertion of an error in a transcript Plaintiffs relied on to oppose the initial motion for summary judgment militates in favor of considering Defendants' present, renewed motion for summary judgment. In Plaintiffs' response to Defendants' initial motion for summary judgment, Plaintiffs stated, as Undisputed Material Fact 33, that "Fitch did not warn George that, if he did not drop the knife, Fitch was going to use deadly force." Doc. 29 at 10. Plaintiffs then argued, "Even Fitch acknowledges that he never warned George that he was going to use lethal force." *Id.* at 17 (citing Officer Fitch's deposition, Doc. 30-2 at 153:7-11). In its June 28, 2022 Opinion, the Court also focused on Officer Fitch's deposition to conclude, "Although Officer Fitch had his gun pointed at Mr. Herrera, he did not verbally warn Mr. Herrera that he would shoot Mr. Herrera if Mr. Herrera did not comply with his commands."

Doc. 40 at 3. In accepting this fact, the Court in a footnote explained the rejection of Defendants'

competing fact:

> Defendants offer as an undisputed fact that, after identifying himself as a police
> officer, Officer Fitch "then" continued to tell Mr. Herrera to stop advancing and
> drop the knife, but Mr. Herrera proceeded forward. UMF No. 14. Plaintiffs do not
> dispute this characterization of Officer Fitch's deposition testimony. Doc. 29 at 5.
> They assert, however, "Even if Fitch did tell George to drop the knife, there is a
> factual question as to whether George's failure to do so was due to willful non-
> compliance or because he could not see Fitch and did not understand he was law
> enforcement." *Id*. at 17. Whether Mr. Herrera appeared confused and, because he
> had a flashlight shining in his face, indicated he did not understand that the
> command to drop the knife was coming from a police officer, could be significant
> to a jury's determination of whether a reasonable officer would perceive Mr.
> Herrera as being hostile. Similarly, how much time Mr. Herrera had to drop the
> knife after Officer Fitch identified himself as a police officer could be significant
> to a jury. *See Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (considering
> as a fact in the reasonableness determination whether a jury could find that the
> plaintiff "did not 'refuse' to drop the knife because he was not given sufficient
> time to comply"). Thus, a close review of Officer Fitch's deposition testimony is
> warranted.
>
> Officer Fitch initially testified at his deposition that he ordered Mr. Herrera to
> drop the knife. Doc. 30-2 at 135:12-16, 146:9-12, 147:12-15. Then, Mr. Herrera
> asked "Who are you?" *Id.* at 137:20. Officer Fitch identified himself. *Id.* at
> 137:22. "And then [Mr. Herrera] began to walk towards [Officer Fitch] with the
> knife still in his hand." *Id.* at 139:2-3. Officer Fitch later testified, "But I didn't,
> again, command him to stop and drop the weapon, drop the knife." *Id.* at 153:10-
> 11. Thus, Officer Fitch did not testify that he told Mr. Herrera to drop the knife
> after identifying himself as a police officer. Nor does this testimony provide
> evidence about how much time passed between Officer Fitch identifying himself
> as a police officer and his shooting Mr. Herrera. The Court, therefore, does not
> accept as an undisputed fact that Officer Fitch commanded Mr. Herrera to drop
> the knife after he identified himself as a police officer or that he gave Mr. Herrera
> sufficient time to comply with this command after he identified himself as a
> police officer. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot
> be or is genuinely disputed must support the assertion by citing to particular parts
> of materials in the record . . . .").

Doc. 40 at 3 n.2.

Thus, central to the Court's analysis was its belief that Officer Fitch admitted in his

deposition that, after he identified himself as a police officer he "didn't, again, command him to

stop and drop the weapon, drop the knife." *Id.* (quoting Doc. 30-2 at 153:10-11). Based on this admission, the Court could not "accept as an undisputed fact that Officer Fitch commanded Mr. Herrera to drop the knife *after* he identified himself as a police officer or that he gave Mr. Herrera sufficient time to comply with this command *after* he identified himself as a police officer." *Id.* Based on Defendants' concessions (for purposes of the first summary judgment motion) that there was 20 feet between Officer Fitch and Mr. Herrera at the time of the shooting and that Officer Fitch was not retreating, combined with evidence that Officer Fitch may have shot Mr. Herrera immediately after identifying himself as a police officer and without further warning, the Court concluded that "a reasonable jury could find that Mr. Herrera was noncompliant solely due to confusion, which would have been apparent to a reasonable officer; that he was evincing no hostility through gestures or otherwise; that he was outside 'striking distance'; that he was not charging the officer; and that he was not a danger." Doc. 40 at 17. That is, drawing all reasonable inferences in Plaintiffs' favor, a reasonable jury could have accepted the following picture: a homeowner whose house is burning down walks out of the woods with a knife at his side, tip pointed down; has an unknown person shine a flashlight in his eyes; asks that person to identify himself; the person identifies himself by name and as a police officer; and then, without further warning or time to comply, the police officer shoots the man.

In their most recent motion for summary judgment, however, Defendants point out that Officer Fitch timely corrected his deposition transcript. On June 8, 2021, just over one month after his May 3, 2021 deposition, Officer Fitch corrected the transcript, asserting he said, "But I *did*, again, command him to stop and drop the weapon, drop the knife" rather than, "But I *didn't*, again, command him to stop and drop the weapon, drop the knife." Doc. 136-2 at 1-2 (emphasis added). The Court does not believe Plaintiffs intentionally relied on a portion of Officer Fitch's

12

transcript without informing the Court that Officer Fitch later corrected this portion. Indeed, it appears that both parties forgot about this correction as Defendants also did not alert the Court to this correction when briefing to the first motion for summary judgment. Further, at oral argument, Plaintiffs maintained their position that Officer Fitch testified that he "didn't" command Mr. Herrera to drop his knife after identifying himself as a police officer. Nonetheless, because the Court might have relied on a portion of Officer Fitch's transcript that Officer Fitch timely corrected, and that might be the opposite of what Officer Fitch actually said, manifest injustice would occur if the Court did not at least consider whether the dispute of fact regarding Officer Fitch's testimony is reasonable and material.

The more difficult question is whether, having decided to take a fresh look at Officer Fitch's qualified immunity motion in light of his corrected deposition testimony, the Court should also consider Defendants' new evidence instead of holding them to their previous concessions. Specifically, for purposes of their first summary judgment motion, Defendants characterized as immaterial, and so did not challenge, Plaintiffs' assertion that Officer Fitch never retreated and that 20 feet separated the two at the time of the shooting. The Court concludes that, given its decision to conduct a de novo analysis of Officer Fitch's qualified immunity assertion in light of his corrected deposition testimony, a correct decision on the merits is more likely to be achieved if the Court considers all evidence and argument relevant to the merits of Officer Fitch's qualified immunity motion. The Court, therefore, exercises its discretion to consider new evidence and argument related to: the distance between Officer Fitch and Mr. Herrera at the time of the shooting; whether Officer Fitch was retreating at the time of the shooting; and whether Officer Fitch, after identifying himself as a police officer, warned Mr. Herrera to stop and/or drop the knife.

Lastly, Plaintiffs argue that, even if the Court is inclined to reevaluate Defendants' assertion of qualified immunity, it should not consider Officer Fitch's recent and newly-provided declaration or Defendants' expert reports. Looking first at Officer Fitch's declaration, in the present motion for summary judgment, Defendants attach a declaration Officer Fitch executed around the same time they filed their renewed motion. Doc 136-2. In contrast, when presenting statements from Officer Fitch in their initial motion for summary judgment, Defendants only relied on Officer Fitch's deposition testimony. *See* Doc. 20-2. The Officer Fitch declaration is mostly dedicated to clarifying the did/didn't deposition correction discussed above. Doc. 136-2 ¶¶ 2-7. Plaintiffs, however, argue that the declaration also includes factual assertions made for the first time:

> Defendant Fitch states for the first time that he took three to four steps to reach Mr. Herrera from where Fitch fi[r]ed his weapon, Defendant's Second Motion (Doc. 136) SUMF ¶ 23, the time between when he saw Mr. Herrera and when he shot him was 20-25 seconds, SUMF ¶ 25, the "enclosure . . . was dark and cluttered with debris, obstacles, and trip hazards," and he could not move to his left or right, Defendant's Second Motion (Doc. 136) SUMF ¶ 27.

Doc. 150 at 9 (citing Doc. 136-2 ¶¶ 9, 10, 12). Plaintiffs assert that the Court should disregard these factual assertions because the declaration is a sham affidavit. *Id.* at 10. Plaintiffs are correct that a court may disregard an affidavit that conflicts with the affiant's prior sworn statements if the court concludes that the affidavit "constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

Nonetheless, Plaintiffs' sham-affidavit argument fails because Officer Fitch's declaration does not conflict with his deposition. The only potential conflict in the declaration concerns whether Officer Fitch originally testified that he "didn't again warn" Mr. Herrera to drop the knife as opposed to testifying that he "did again warn" Mr. Herrera to drop the knife. But Officer Fitch did not wait until submitting his declaration to attempt to correct this portion of his

deposition transcript; instead, he timely filed a deposition correction, *see* Doc. 136-2 at 4-5, and uses his declaration to explain the previously-submitted deposition correction. As to the remaining factual assertions in Officer Fitch's declaration about which Plaintiffs complain, Plaintiffs do not cite any portions of Officer Fitch's deposition testimony that are contradictory. Instead, Officer Fitch's deposition testimony supports the statements he reiterates in his declaration. *See* Doc. 30-2 at 144:8-15 (stating that Mr. Herrera was 8 to 10 feet away at the time of the shooting); 144:2-8 (stating that he did not have time for de-escalation techniques during the encounter); 149:12-23 (stating that he could not walk to his left or his right because of a fence and piles of wood on the ground). Accordingly, the Court rejects Plaintiffs' argument that Officer Fitch's newly-submitted declaration is a sham affidavit.

Turning to the question of Defendants' experts, Defendants attach to the present motion an expert report as well as deposition testimony of two of their experts. Docs. 136-3, 136-4, 136-6. Defendants rely on the experts for the following factual assertions: "By holding the knife at his side, Mr. Herrera could have easily made upward thrusts to vulnerable areas which could defeat an officer's body-armor. *See* Expert Report of Jack Ryan (attached hereto as Exhibit 3) at ¶¶ 74, 75; *see also* Deposition transcript of Jack Ryan (attached hereto as Exhibit 4) at pp. 100:12 – 101:19"; "Plaintiffs' expert agrees that Mr. Herrera's knife was lethal, and that Mr. Herrera could have inflicted lethal harm with the knife. *See* Deposition of Joey Gallegos (attached hereto as Exhibit 6) at pp. 35:9 – 36:13"; "When Officer Fitch encountered Mr. Herrera in the horseshoe-shaped enclosure, Officer Fitch reasonably suspected that Mr. Herrera was involved with the suspected arson on the property because he matched the description that Mr. Bertucci provided (male, wearing a welder's cap/beanie style hat) and because he was present on the scene. Exhibit 1, pp. 170:9 –172:19; Exhibit 4 pp. 60:8 – 61:7. Mr. Herrera also committed

an aggravated assault on Officer Fitch by approaching him with a knife and refusing to follow commands. *Id.*; *see also* Exhibit 4 pp. 91:6-23, 92:6 – 94:10, 95:6 – 96:5, 98:6 – 99:5." Doc. 136 ¶¶ 13, 15, 28, 29.

Plaintiffs argue the Court should disregard these expert statements because they are not "statements of fact but are opinions and suppositions" of their experts who do "not have firsthand knowledge of the use of force in this case." Doc. 150 at 8. The Court agrees these expert opinions should not be used to evaluate the factual allegations of what happened between Officer Fitch and Mr. Herrera the night of the shooting. That is, the Court is examining what a reasonable juror could or could not conclude from the evidence presented and expert opinions are not needed to evaluate the facts at issue.

## FACTUAL BACKGROUND

### 1. Changes to Factual Background

As before, at this summary judgment stage, the Court draws all reasonable factual inferences from the evidence in favor of the non-moving party—Plaintiffs. However, the Court must consider whether Defendants' deposition correction, withdrawal of their factual concessions, and submission of additional evidence alters the factual backdrop. After reviewing the evidence and drawing all reasonable factual inferences in Plaintiffs' favor, the factual backdrop has changed in the following categories.

### A. Officer Fitch Retreating

In support of their assertion that Officer Fitch was not retreating when he shot Mr. Herrera, Plaintiffs rely on the first two seconds of Officer Fitch's lapel camera video that captures the shooting. Doc. 29 at 5; Doc. 150 at 7. If there is video evidence that "blatantly contradicts the plaintiff's version of events[,]" however, the Court "will accept the version of the

facts portrayed in the video." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)) (cleaned up). Going frame-by-frame through the first two seconds of this video, in contrast to Plaintiffs' characterization of the video, the video indisputably shows Officer Fitch retreating before, and at the time, he shoots Mr. Herrera. *See* Docs. 30-11, 132-2E (lapel video).

The first frame of the video shows two trees that are serving as fence posts. Mr. Herrera is walking forward and has reached the first fence post. The second fence post appears to be about 3 feet in front of the first (toward Officer Fitch's location) and about 2 feet in front of the second fence post is a full black trash bag. In the first frame, Officer Fitch's flashlight (and presumably his gun) are just over, or just behind, this trash bag. Advancing frame by frame, more of the trash bag comes into view as Officer Fitch backs away from it. Plaintiffs present no evidence, other than this video, in support of their contention that Officer Fitch was not backing away when he shot Mr. Herrera. Doc. 150 at 7 (citing Doc. 29 ¶ 15).

In support of their argument that Officer Fitch was retreating, Defendants present evidence, in addition to the video, in the form of deposition testimony and declarations. First, Officer Fitch testified that he moved backwards, towards an A-frame structure behind him, until he could not back up any further, as Mr. Herrera moved towards him. Doc. 136-1 at 149:24 to 150:12, 151:17-25; *see also* Doc. 136-2 ¶ 7 (Officer Fitch's declaration, stating that, while Mr. Herrera was advancing, he was backing up and backed up as far as he could).

Wayne Jenkins, an EMT present at scene, provided a declaration averring that, not long after his arrival on the scene, he heard screaming behind him and he turned around to see "Officer Fitch backing up and aiming his firearm at Mr. Herrera, who was approaching and closing the distance between the two of them." Doc. 136-7 ¶ 5. He confirmed that Officer Fitch was "steadily backing up . . . while Mr. Herrera was advancing quickly towards Officer Fitch."

*Id.* ¶ 6; *see also* Doc. 132-7A at 2:38-52 (audio of Mr. Jenkin's statement to New Mexico State Police made May 5, 2019 at 11:57 a.m., a few hours after the shooting, in which he states that he saw Officer Fitch "backing up, backing up, backing up" and "there was a guy coming at him, slowly closing the gap"); Doc. 151-2 (same). Mr. Jenkins' EMT partner, David Varela, similarly provided a declaration stating that he heard screaming and turned around to see "Officer Fitch backing up and aiming his firearm at Mr. Herrera, who was approaching him with a knife in his hand and closing the distance between then two of them." Doc. 136-8 ¶ 5; *see also id.* ¶ 6 ("Although Officer Fitch was backing up, Mr. Herrera was closing the distance between the two."); Doc. 132-8A at 4:14-6:32 (audio of Mr. Varela's statement New Mexico State Police made May 5, 2019 at 11:29 a.m., a few hours after the shooting, in which he states that he saw the Officer Fitch "walking backwards" and that while Officer Fitch "was still coming back" Mr. Herrera "took 2 or 3 quick steps"); Doc. 151-1 (same).

Thus, on the issue of whether Officer Fitch was attempting to retreat when he shot Mr. Herrera, the evidence only points one direction: Officer Fitch was retreating when he shot Mr. Herrera. No reasonable jury could consider this evidence and conclude otherwise.

B.   Tripping Hazards and Escape Routes

Related to the issue of retreat, Defendants argue that the horseshoe-shaped enclosure where Officer Fitch was standing before backing up to the A-frame structure was "dark and cluttered with debris, obstacles, and trip hazards" and, as a result, "before backing up, he could not move left or right." Doc. 136 at 7-8. Further, Defendants argue, "Attempting to move backward in dark, unfamiliar terrain could cause an officer to trip and lose their footing." Doc. 136 at 8. In response, Plaintiffs reassert their position that "there was a large open space to

18

Fitch's left and additional space to his right" and "Fitch could have exited to the South." Doc. 150 at 7 (citing Doc. 29 ¶¶ 15-16, 36-37).

When asked at his deposition whether he had the opportunity to walk right or left, away from the A-frame structure behind him, Officer Fitch responded, "No . . . To my right was one of those, quote, 'fence structures' I was telling you about. To my left was another pile of wood on the ground. The only direction I had to go was walk backwards." Doc. 136-1 at 149:13-23. Later, when again asked whether he could have moved to the left or the right, he responded, "Again, there were obstacles on my right and on my left. I could only go backwards." Doc. 136-1 at 152:1-4. In Officer Fitch's more recently submitted declaration he states, "The area that we were in was dark and cluttered with debris and obstacles, and I did not want to take my eyes off Mr. Herrera as he was approaching me with a knife." Doc. 136-2 at ¶ 9. In support of his contention, Officer Fitch attached various photos of the scene which he asserts "fairly depict the area, debris, and obstacles that were present that morning." *Id*. at 8-11.

As evidence that Officer Fitch could move to his right or left, Plaintiffs also present Officer Fitch's testimony. Doc. 29 at 11 ¶¶ 36-37. Specifically, Officer Fitch testified that there was an opening to the right and to the left. Doc. 30-2 at 187:14-22. When asked, "So then is it inaccurate that you cannot have gone to the left or to the right because they are both openings?", Officer Fitch responded, "From what I remember, I couldn't. So I told you what I remember. But yes, it is accurate, looking at the picture in 20/20 hindsight." Doc. 30-2 at 188:17-23. He further acknowledged that he could have exited from the area via the same route he arrived to the area. Doc. 30-2 at 189:2-14. He later clarified, however, that, "I know a lot of things in hindsight, but at that moment, I was focused on the threat." Doc. 30-2 at 210:1-2.

Thus, the evidence both parties present demonstrates that Officer Fitch and Mr. Herrera were outside in an open area with a large open space to both Officer Fitch's left and right. It shows there was no fence or other structure around the A-frame that would have prevented a person from walking around the A-frame. Thus, it is *possible* that Officer Fitch could have increased the distance between himself and Mr. Herrera by going to his left, to his right, or back the way he came. The relevant question, however, is not whether photos and videos taken during the daylight and studied in a non-stressful situation with the benefit of time and hindsight demonstrate that it would have been possible for Officer Fitch to have escaped to his left or right, or back the way he came. Instead, the reasonableness of Officer Fitch's assessment that he could not safely escape and so had to use deadly force must be judged from the perspective of a reasonable officer *on the scene*, rather than with the 20/20 vision of hindsight. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).

The photos and videos of the scene, taken during the daytime, at some point following the shooting, indisputably show tripping hazards in every direction. *See* Doc. 30-4 (Plaintiff Crystal Herrera's affidavit, indicating that Plaintiffs' photos and videos "fairly and accurately depict what the imag[e] is purporting to be"). The photos Plaintiffs took show the open area next to the A-frame structure and also show trees, wood cuttings, stumps, and other debris throughout the area. Docs. 30-5, 30-6, 30-7, 30-8. Similarly, Plaintiffs submitted a video of the area approaching the A-frame structure and the fencing from the east (what would have been Officer's Fitch left side as he backs up towards the A-frame structure). In addition to open space,

the video shows trees, stumps, and debris in the area Mr. Herrera and Officer Fitch were standing

and to either side of the A-frame structure that Officer Fitch would have had to pass by before

getting to the open area. Doc. 30-9; *see* Doc. 30-10 (video showing the same trees, stumps, and

debris). This depiction of the scene is consistent with photos Defendants submitted showing

trees, stumps, and pieces of chopped wood throughout the area where Officer Fitch and Mr.

Herrera were standing. Doc. 136-2 at 8-11. Likewise, the drone photo of the area the New

Mexico State Police took the morning of the shooting shows trees, stumps, and lose wood pieces

to either side of the A-frame structure—i.e., to the right and to the left of where Officer Fitch

was backing up. Doc. 30-13.

Officer Fitch's lapel camera footage from the night of the shooting shows him walking

around the general area before the shooting, including up to the fence and A-frame structure.[6]

Doc. 30-1 at 2:28-2:53. As with the photos and videos taken after the fact, this contemporaneous

video recording shows trees on either side of the A-frame structure and stumps and debris

littering the area. *Id.* Indeed, there appears to be more debris in the area at the time of the

shooting than in the photos and videos taken after the fact. For example, at one point Officer

Fitch walks to the side of the A-frame structure (which would have been his right side when

backing up from Mr. Herrera) and the video captures a large pile of dead trees stacked on the

ground that impede the path from the area of the shooting to the open field. *Id.* at 4:02-4:12.

---

[6] Officer Fitch explains in his declaration that the first lapel camera recording captures the scene when he first arrived, before he turned off his lapel camera. Doc. 136-2 ¶ 8. He started the second lapel camera recording immediately after the shooting, once he could free a hand from his weapon and turn his lapel camera back on. *Id.* ¶¶ 7-8. Even though Officer Fitch did not turn his camera back on until after he shot Mr. Herrera, the lapel camera maintains footage from 30 seconds before the camera is turned on. *Id.* ¶¶ 7-8.

Thus, it cannot be reasonably disputed that, at the time of the shooting, Officer Fitch was in a forested area at night,[7] full of trees, stumps, and debris that created tripping hazards behind him and in the possible escape routes to either side of him.

C.  Distance at the Time of the Shooting

To support their assertion that the gap between Officer Fitch and Mr. Herrera was 20 feet at the time of the shooting, Plaintiffs submit videos of the scene. Docs. 30-9, 30-10. Plaintiffs' exhibit 30-10 shows a tape measure starting from the edge of the A-frame structure that was behind Officer Fitch at the time of the shooting and ending at or just past the first fence post. Doc. 30-10 at 0:01-0:10. When Mr. Herrera was shot, he was walking forward and had reached a few feet behind a trash bag such that, when he fell forward, his head was touching the edge of the trash bag farthest from Officer Fitch. Doc. 30-11 at 0:02 to 0:31 (Officer Fitch's lapel footage). Mr. Herrera's hip is even with the second fence post and his feet are in front of the first fence post (between the first and second fence post almost to the first fence post). *Id.* at 0:31. Although the trash bag is no longer present in Plaintiffs' video, a factfinder comparing this video with Officer Fitch's lapel video could easily determine on exhibit 30-10 where the trash bag had been in comparison to the surrounding fence posts. Thus, a reasonable juror could conclude from the videos that the ending point of the tape measure depicted on Plaintiffs' exhibit is a fair approximation of Mr. Herrera's location at the time he was shot.

---

[7] Although a large house fire was burning during the night, which would presumably put out light, Officer Fitch's lapel video makes clear that the area where the encounter happened was dark and illuminated only by Officer Fitch's flashlight. Doc. 30-11 at 0:00-0:06. Indeed, as established in the prior summary judgment briefing, the parties do not dispute that Officer Fitch's flashlight illuminated Mr. Herrera at the start of the encounter. Doc. 20 at 3 ¶ 8; Doc. 29 at 4 ¶ 8; *see also* Doc. 168-4 at 68:3-5 (Tucker Cottam's deposition, indicating that the "fire's pretty much out" by the time of the encounter); Doc. 168-3 at 62:24 to 63:3 (Craig Sime's deposition, stating that when he heard Officer Fitch yelling, he "looked towards the direction" but "can't see anybody because it's still dark").

The distance between Plaintiffs' reasonable approximation of Mr. Herrera's location when shot and the edge of the A-frame structure is 20 feet. Doc. 30-10 at 0:19. Any reasonable juror, however, would have to conclude that the distance between Officer Fitch and Mr. Herrera at the time of the shooting was less than 20 feet. As noted above, Officer Fitch's lapel camera shows that he was backing up from just before the trash bag between him and the second fence post. Doc. 30-11 at 0:00 to 0:02. The video does not capture what was behind Officer Fitch and so does not show the distance between the A-frame structure and Officer Fitch at the time of the shooting. Even if Officer Fitch had backed up all the way to the A-frame structure, however, at the time of the shooting he would have been standing in front of the A-frame structure with his arms extended. Thus, the maximum distance between Officer Fitch and Mr. Herrera at the time of the shooting had to be no more than 17 feet. Plaintiffs did not dispute this at oral argument. Recording at 10:53:57-10:54:35 (December 6, 2023).

Defendants argue, "When Mr. Herrera had closed within 8 to 10 feet, Officer Fitch discharged his weapon once, shooting Mr. Herrera." Doc. 136 at 2; *see also* Doc. 136 at 6 ¶ 19. In support of this assertion, Defendants cite Officer Fitch's deposition. *See* Doc. 136-1 at 144:4-13; *see also* Doc. 136-2 ¶ 11 (Officer Fitch's declaration, stating the same). Likewise, in his declaration, Officer Fitch states that, after the shooting, it "only took [him] three or four steps to reach Mr. Herrera from where [Officer Fitch] fired [his] weapon." Doc. 136-2 ¶ 12. Defendants also submit declarations from EMTs Wayne Jenkins and David Varela. Mr. Jenkins estimated the distance between Officer Fitch and Mr. Herrera to be four to five feet at the time Officer Fitch fired a shot. Doc. 136-7 ¶ 7 (Jenkins declaration); Doc. 132-7A at 8:39-8:53 (Jenkins statement to New Mexico State Police). Mr. Varela estimated the distance between the two to be

around 10 feet when Mr. Herrera "increased his speed and took two or three quick steps towards Officer Fitch" and Officer Fitch then fired his weapon. 136-8 ¶ 7.

A reasonable jury could review the videos, accept Officer Fitch's estimate, and conclude that Mr. Herrera was within 8 feet of Officer Fitch when Officer Fitch fired his gun. At this stage, however, the Court must view the facts in the light most favorable to Plaintiffs. Doing so, and drawing all reasonable inferences in favor of Plaintiffs, a reasonable jury could conclude from the video in evidence that the distance between Officer Fitch and Mr. Herrera was as much as 17 feet at the time of the shooting.

D.  Speed of Advance

Related to distance is the speed at which Mr. Herrera was approaching Officer Fitch as Officer Fitch retreated. Defendants assert that "Mr. Herrera was advancing quickly toward [Officer Fitch] as [Officer Fitch] was backing up," and that the distance between the two closed from around 30 feet to 8 to 10 feet. Doc. 136 at 6 ¶¶ 18-19. Plaintiffs dispute the "quickly" characterization, Doc. 150 at 8, and assert that Mr. Herrera "walked toward Fitch and did not run." Doc. 29 at 10 ¶ 26. Likewise, as discussed above, Plaintiffs dispute the distance between the two at the time of the shooting. Plaintiffs, however, do not dispute the fact that, at the beginning of the encounter, Officer Fitch and Mr. Herrera were about 30 feet apart. *See* Doc. 20 at 3 ¶ 9, Doc. 29 at 4 ¶ 9; Doc. 29 at 9 ¶ 17 (prior summary judgment briefing, which Plaintiffs incorporate in the present briefing, in which Plaintiffs do not dispute that when Officer Fitch first saw Mr. Herrera, "Mr. Herrera was standing with a knife in his rights hand, about 30 feet away from [Officer] Fitch").

Officer Fitch testified in his deposition that, as he was walking around, he came upon Mr. Herrera (who was visible because Office Fitch was shining his flashlight) and there was about 30

feet between the two men. Doc. 30-2 at 131:24 to 132:6. Mr. Herrera was standing at the

entrance to a horseshoe-shaped area and Officer Fitch was standing a few feet away from the A-

frame structure. *Id.* at 131:4-23. After Officer Fitch identified himself, Mr. Herrera "began to

walk towards [Officer Fitch]," *id.* at 137:19-23, closing the distance between the two to about 8

to 10 feet, *id.* at 144:4-17. Office Fitch described the walking as "quickly" and "in a deliberate

manner," but not running. *Id.* at 144:4-7, 152:9-18; *see also id.* at 147:16-19 (describing Mr.

Herrera as "rather calm, very deliberate"); *id.* at 148:10-15 (describing Mr. Herrera as deliberate,

meaning he was "very focused on something"). Indeed, Officer Fitch's lapel video captures

almost two seconds before the shooting and during that time Mr. Herrera is walking, not running,

towards Officer Fitch. Doc. 30-11 at 0:00 to 0:05.

EMT witness Wayne Jenkins, in his declaration, described Mr. Herrera as "advancing

quickly toward Officer Fitch, closing the distance between the two of them." Doc. 136-7 ¶ 6.

Plaintiffs argue that Mr. Jenkins' testimony is not credible because this statement is inconsistent

with his earlier statement to the New Mexico State Police, in which he described Mr. Herrera as

"slowly closing the gap." Doc. 132-7A at 2:46-2:48, 6:27-6:29, 7:55-7:58, 13:34-13:38; *see also*

Doc. 151-2 (same statement). The Court agrees that, regarding how fast Mr. Herrera was moving

toward Officer Fitch, Plaintiffs are entitled to an inference that Mr. Herrera was walking and not

moving quickly toward Officer Fitch.[8]

---

[8] Plaintiffs also attack Mr. Jenkin's declaration because, "In [his] statement to NMSP on the date
of the incident, he said that he never saw Mr. Herrera with a weapon. He only became aware of
the knife after the shooting." Doc. 150 at 8. Although this is an accurate representation of Mr.
Jenkin's statement to state police, Doc. 151-2 at 3:00-3:12, he does not then contradictorily claim
in his declaration that he did see the knife. *See generally* Doc. 136-7. And that Mr. Herrera was
holding a knife is not in dispute—the knife is visible in the lapel recording. *See* Doc. 30-11. That
Mr. Jenkins did not see the knife is insufficient reason to disregard what Mr. Jenkins says he did
see, or to discount his entire declaration.

EMT witness David Varela stated in his affidavit that, upon hearing screaming, he turned and saw "Officer Fitch backing up and aiming his firearm at Mr. Herrera, who was approaching him with a knife in his hand and closing the distance between the two." Doc. 136-8 ¶ 5. He further explained that "when Mr. Herrera was approximately ten feet from Officer Fitch, he increased his speed and took two or three quick steps toward Officer Fitch." *Id.* ¶ 7. In his statement to New Mexico State Police made shortly after the shooting, Mr. Varela recounted that, while Officer Fitch was walking backwards and giving commands to "put it down," Mr. Herrera was "coming at him" and "charging him." Doc. 151-1 at 4:25-5:23. He stated that while Officer Fitch was "coming back," Mr. Herrera took "two or three quick steps" before Officer Fitch fired. *Id.* at 5:59-6:14; *see also id.* at 6:15-6:32 (describing the movement as "holding, holding" and then he "sped up" and took "two or three quick steps"); *id.* at 14:30-14:45 (describing the movement as "not launched" but took "two three quick steps"). He further stated that the distance between two was "shortened" as Mr. Herrera approached Officer Fitch and that Mr. Herrera was "a lot closer" when he took the steps towards Officer Fitch. *Id.* at 6:38-7:13.

Plaintiffs also attack Mr. Varela's affidavit as not credible given inconsistencies with his statement to state police. Specifically, Plaintiffs argue, "Mr. Varela provided a recent sworn affidavit that Mr. Herrera 'increased his speed,' though in his prior statement he said that Mr. Herrera was 'holding, holding, then took two or three quick steps.[']" Doc. 150 at 8. But saying Mr. Herrera increased his speed is consistent with a statement that Mr. Herrera was holding and then took two or three quick steps.[9]

---

[9] Plaintiffs also complain that Mr. Varela said in his recent affidavit that Mr. Herrera would have stabbed Officer Fitch, but did not earlier make the same statement to state police. Mr. Varela's speculation about what Mr. Herrera may or may not have done plays no part in the Court's analysis. Further, the omission of this statement to state police provides insufficient reason to discount Mr. Varela's affidavit.

In sum, the facts are undisputed that, although Mr. Herrera was moving toward Officer Fitch, he was not running toward him. Exactly how fast—short of a run—Mr. Herrera was moving is in dispute. Thus, viewing the facts in the light most favorable to Plaintiffs, for the purposes of this motion, the Court assumes that Mr. Herrera was slowly walking, not running, towards Officer Fitch. Additionally, it is undisputed that Mr. Herrera was closing the distance between himself and Officer Fitch as Mr. Herrera walked forward. That is, as discussed above, Plaintiffs present evidence to create a dispute of fact as to how far apart Officer Fitch and Mr. Herrera were at the time of the shooting such that, viewing the facts in the light most favorable to Plaintiffs, the Court assumes for the purposes of this motion that the distance was as much as 17 feet. However, Plaintiffs present no evidence to dispute Defendants' evidence that Officer Fitch and Mr. Herrera started out about 30 feet apart and that Mr. Herrera "closed the gap" between the two as he moved forward and Officer Fitch retreated.

E.   Identification and Warning

In the prior summary judgment briefing, Plaintiffs did not dispute that, upon first encountering Mr. Herrera standing with the knife, Officer Fitch yelled something to the effect of "George, drop the knife"; Officer Fitch then repeated this order and Mr. Herrera asked who he was; Officer Fitch identified himself as Angel Fire Police and Mr. Herrera asked "which one"; Officer Fitch responded, "Officer Fitch." Doc. 20 ¶¶ 10-11; Doc. 29 at 4 ¶¶ 10-11. What was in dispute in the prior summary judgment briefing was whether, *after* identifying himself, Officer Fitch gave Mr. Herrera a warning before shooting. Doc. 40 at 3 n.2. In the present briefing, Plaintiffs no longer concede that Officer Fitch identified himself. Instead, they assert that although several witnesses state they heard Officer Fitch say "drop the knife" before shooting,

these witnesses did not also state that Officer Fitch identified himself.[10] Doc. 168 at 1. Given the disputes about whether Officer Fitch identified himself and whether he warned Mr. Herrera before shooting him, and given the new evidence on these topics both sides provide, the Court addresses the relevant evidence in detail.

At his deposition, Officer Fitch testified that, when he first encountered Mr. Herrera, he saw the knife in Mr. Herrera's hand and yelled something to the effect of "George, drop the knife." Doc. 30-2 at 135:10-16, 136:9-12. Mr. Herrera asked, "Who are you?" and Officer Fitch responded with something to the effect of "Angel Fire Police." *Id.* at 137:16-22. Mr. Herrera then asked, "No, which one?" and Officer Fitch said "Officer Fitch." *Id.* at 137:21-22. 138:20-25. Mr. Herrera then began to walk towards Officer Fitch, and Officer Fitch gave him multiple commands (three or four) to stop and drop the knife before shooting. *Id.* at 137:23, 144:4-7, 146:9-12.

When asked at the deposition if he gave Mr. Herrera a specific warning, such as "I'm going to shoot if you do not put down the knife," Officer Fitch testified no. *Id.* at 152:5-10. Plaintiffs' counsel again later asked, "okay. And so you didn't give him any verbal warnings, you would agree with me?" *Id.* at 153:7-8. The uncorrected deposition transcript Plaintiffs submitted reflects that Officer Fitch responded with, "On the fact that I was (inaudible) that he didn't stop, no, ma'am. But I didn't, again, command him to stop and drop the weapon, drop the knife." *Id.* at 153:9-11. Officer Fitch timely corrected that portion of the transcript, asserting that during the deposition he said, "On the fact that I was going to shoot him if he didn't stop, no,

---

[10] In Plaintiffs' response brief, they incorporate their prior dispute that Officer Fitch did not warn Mr. Herrera to drop the knife or Officer Fitch would use deadly force. Doc. 150 at 7 (citing Doc. 29 at 10 ¶ 36). In their supplemental response, however, they argue and present witness statements that Officer Fitch did warn Mr. Herrera to drop the knife before shooting. Doc. 168.

ma'am. But I did, again, I commanded him to stop and drop the weapon, drop the knife." Doc. 136-2 ¶ 4 (Officer Fitch declaration).

In their briefing, Plaintiffs do not argue that the original transcript, rather than Officer Fitch's correction, accurately represents what Officer Fitch said. At oral argument, however, Plaintiffs maintained that the original transcript is accurate—that Officer Fitch testified he "didn't" warn Mr. Herrera to drop the knife after he identified himself as a police officer. The Court has the actual recording of what Officer Fitch said. Doc. 132-2A. Leading up to Officer Fitch's statement, Plaintiffs' counsel asked, "And so, you didn't give him any verbal warnings; you would agree with me?" *Id.* at 0:00-0:06. Officer Fitch clearly responds "on the fact that" followed by something the transcript states is inaudible. *Id.* at 0:06-0:10. Listening to Officer Fitch's testimony, however, it is clear to the Court that he says, "On the fact that I was going to shoot if he did not stop, no ma'am." *Id.* at 0:06-0:11. Thus, Officer Fitch agreed he did not explicitly warn Mr. Herrera that he was going to shoot him if Mr. Herrera did not stop (the "no ma'am" indicates that he did not issue that warning). Officer Fitch then begins his next sentence with the word "but", contrasting this no-warning with the warning he describes next: "I commanded him to stop and drop the weapon, drop the knife." *Id.* at 0:10-0:15. The structure of Officer Fitch's response is more consistent with him describing the warning he did not give ("I'll shoot if you don't drop the knife") and then contrasting that with the warning that he claims he did give ("drop the knife").

This interpretation is also consistent with Officer Fitch's earlier deposition testimony. *See* Doc. 30-2 at 144:4-7 ("There was no time for de-escalation techniques as he was walking on me in a deliberate manner with the knife. I gave him commands to drop the knife, stop drop the knife multiple times until he was very close."); *id.* at 146:9-12. ("Q. Okay. And how many times do

you think you told him to stop and drop the knife? A. At least three times that I remember, I believe four."); *id.* at 152:5-10 ("Q. Did you give any verbal warnings to Mr. Herrera before you shot him, something to the effect of 'Mr. Herrera, I'm going to shoot you if you don't put down the knife?' A. He advanced too quickly and . . . so no, I did not."); *see also* Doc. 136-2 ¶ 7 (Officer Fitch's declaration, clarifying that he testified that when he encountered Mr. Herrera, he "ordered Mr. Herrera to drop the knife, and in response, [Mr. Herrera] asked: 'Who are you?' [Officer Fitch] responded by stating: 'Police.' Mr. Herrera then asked: 'No, which one are you?' [Officer Fitch] responded by stating: 'Officer Fitch.' At that point, Mr. Herrera then began advancing on [Officer Fitch] with the knife in his right hand. [Officer Fitch] gave Mr. Herrera at least three additional commands to drop the knife while [he] was backing up.").

Additionally, although Plaintiffs stated at oral argument that they dispute that Officer Fitch testified "did" instead of "didn't", all the witness statements provided by Plaintiffs support Officer Fitch's testimony that he did command Mr. Herrera to drop the knife before shooting. First, Fire Chief of the Eagle Nest Volunteer Fire Department Thomas Scott Gibson provided a declaration, indicating that he "heard Officer Fitch yelling, 'show me your hands, drop the knife,'" and "heard a gunshot." Doc. 168-1. Angel Fire Firefighter John W. Murtagh, Jr. similarly stated in an affidavit that he "heard Officer Mark Fitch of the Angel Fire Police Department yelling to drop the knife," and "heard one gunshot." Doc. 168-2. Angel Fire Assistant Fire Chief Craig Sime testified at his deposition that, when he heard Officer Fitch, "All I heard was, 'Drop the weapon.'" Doc. 168-3 at 60:24 to 61:11. He later agreed that he heard "Drop the weapon", looked over, and then "very quickly" heard a gunshot. *Id.* at 69:1-8; *see also id.* 71:20-24 (when asked "you said you heard 'drop the weapon' and then an immediate shot. Is

that correct," Assistant Chief Sime responded, "Yes. Yes").[11] Lastly, Firefighter Tucker Cottam testified at his deposition that he heard Officer Fitch say "drop your weapon" or "drop the knife" at least two or three times before the gunshot. Doc. 168-4 at 69:3-9, 12-18.

The additional witness statements that Defendants submit supports the conclusion that Officer Fitch did give multiple warnings before shooting. Angel Fire Fire Department Chief John Murtagh swore in his deposition: "So next I turned around and continued doing what I was doing, and I heard Officer Fitch yell out, Angel Fire Police; drop it; drop the knife; George, drop the knife, and then I heard a gunshot." Doc. 136-9 at 29:13-16.

EMT Wayne Jenkins stated in a declaration that he saw the scene unfold from 10 to 15 feet away. Doc. 136-7 at 2 ¶ 5. He stated:

> I saw Officer Fitch steadily backing up and shouting commands to Mr. Herrera. Officer Fitch's commands were loud and understandable. I don't recall the exact words that Officer Fitch used, nor did I recall his exact words when I gave my recorded statement to the New Mexico State Police. However, as I told the State Police during my interview, Officer Fitch was directing Mr. Herrera in a very loud and clear voice to drop his weapon, and he did so three or four times while he was backing up and while Mr. Herrera was advancing quickly toward Officer Fitch, closing the distance between the two of them.
> After Officer Fitch gave Mr. Herrera three or four commands, he fired one shot from his weapon. I saw Mr. Herrera fall forward. As I told the State Police on May 5, 2019, I believe Mr. Herrera was within four or five feet of Officer Fitch when Officer Fitch fired his weapon.

---

[11] At oral argument, Plaintiffs argued that Mr. Sime testified he only heard "drop the weapon" one time before hearing the gunshot. However, in his deposition, when asked "And you heard, 'Drop the weapon' one time," Mr. Sime responded, "Now I honestly cannot remember. I know that we were interviewed by State Police at the time, and that's going to be – being that was within an hour of the incident, there might be, you know, better recollection shown there of exactly what happened. I do know it was said once." Doc. 168-3 at 68:13-22. Plaintiffs did not provide Mr. Sime's State Police statement either during the current briefing, or in briefing the prior motions for summary judgment (which Plaintiffs incorporate into the present motion). Thus, the record before the Court indicates that Mr. Sime does not know how many times Officer Fitch said "drop the weapon." That is, Mr. Sime's deposition testimony does not provide evidence to support that Officer Fitch only said "drop the weapon" one time.

*Id.* ¶¶ 6-7. In his statement to the New Mexico State Police, which he gave a few hours after the shooting, Mr. Jenkins similarly reported that he heard loud screaming 10 to 15 feet behind him and turned around to see Officer Fitch backing up and giving three or four commands to put down the weapon (or put down the knife) before firing. Doc. 132-7A at 2:23-3:12; *see also* Doc. 151-2 (same statement).

EMT David Varela also states, in his affidavit, that he witnessed the events at issue from 10 to 15 feet away. Doc. 136-8 ¶ 5. Mr. Varela explains:

> I saw Officer Fitch steadily backing up and shouting commands to Mr. Herrera. Officer Fitch's commands were loud and understandable. Officer Fitch told Mr. Herrera: "put it down" and "put the knife down, George." Officer Fitch gave that command or [] similarly worded commands to Mr. Herrera four or five times. Although Officer Fitch was backing up, Mr. Herrera was closing the distance between the two of them.

*Id.* ¶ 6. In his statement to New Mexico State Police, Mr. Varela recounted that he heard screaming and heard Officer Fitch saying "put it down"/"put the knife down" (possibly "put it down, George") four times while walking backwards before shooting. Doc. 132-8A at 4:03-6:15; *see also* Doc. 151-1 (same statement).

In sum, although the audio of Officer Fitch's deposition testimony is not crystal clear as to whether he said he "did" or "didn't" warn Mr. Herrera to drop the knife, the evidence presented by both sides, including Officer Fitch's timely deposition correction and the multiple witness statements produced by both sides, indicates that Officer Fitch, before shooting Mr. Herrera, did warn him more than once to drop the knife/weapon. No reasonable juror could look at the evidence and conclude that Officer Fitch testified that he didn't warn Mr. Herrera to drop the knife before shooting.

The next question is whether it is undisputed that Officer Fitch identified himself prior to commanding Mr. Herrera to drop the knife. Based on the witness statements, Plaintiffs answer

no, arguing that a dispute of fact exists as to whether Officer Fitch identified himself as a police officer before telling Mr. Herrera to drop the knife. The Court, however, disagrees with Plaintiffs' interpretation of the witness statements and finds that Plaintiffs have not presented evidence of a factual dispute on this topic.

Plaintiffs support their position with reference to statements by Eagle Nest Fire Department Chief Scott Gibson, Angel Fire Firefighter John W. Murtagh, Jr., Angel Fire Assistant Chief Craig Sime, and Firefighter Tucker Cottam. Doc. 168 at 1. They argue that none of these witnesses heard Officer Fitch identify himself as a police officer. Doc. 168 at 1. It is true that the declarations and deposition testimony from these four witnesses that Plaintiffs provide say nothing about hearing Officer Fitch identifying himself; instead, they provide evidence that these witnesses heard Officer Fitch say something to the effect of "drop the knife." *See* Docs. 168-1 (Gibson declaration); 168-2 (Murtagh, Jr. affidavit); 168-3 (Sime deposition); 168-4 (Cottam deposition).

However, as Defendants point out, these statements do not indicate that the witnesses heard the entire interaction between Officer Fitch and Mr. Herrera. To the contrary, Fire Chief Thomas Scott Gibson provided another declaration, clarifying that he "did not witness the entire interaction between Officer Mark Fitch and George Herrera on May 5, 2019" and he does "not know if Officer Fitch identified himself as a police officer before [he] heard Officer Fitch yelling commands to Mr. Herrera for him to drop the knife." Doc. 169-2 ¶ 3. Similarly, Firefighter John W. Murtagh, Jr. provided a second, clarifying declaration: "To be clear, I do not know if Officer Mark Fitch identified himself as a police officer to George Herrera on May 5, 2019, and I do not know if the two had any interactions before I heard Officer Fitch yelling to drop the knife. At the

time of the incident, I was on the opposite corner of the house from where the incident

occurred." Doc. 161-1 ¶ 3.

> Firefighter Cottam testified at his deposition that:
>
> A. At that time, I heard Officer Fitch start making [a] commotion and talking that there was somebody coming—somebody else said something about somebody was coming out of the trees.
> Q. You said somebody else said something. Are you talking about somebody other than Officer Fitch?
> A. Yes. One of the other volunteers and Officer Fitch, they said something about somebody was coming from the trees. At that time I heard Officer Fitch say, "Drop your weapon," or "Drop"—I don't remember exactly how he said it. "Drop your weapon. Drop your weapon." And there was something said about dropping a knife.

Doc. 168-4 at 68:22 to 69:9. Later in his deposition, when asked if he heard Mr. Herrera say

anything to Officer Fitch prior to the shooting, he clarified: "No. Like I said, I heard just the

commotion and then, you know, 'Drop your weapon. Drop your weapon. Drop your knife,' the

shooting," and that he "wasn't close enough to hear if [Mr. Herrera] did say anything at that

time." Doc. 169-4 at 82:9-11, 21-22.

> Assistant Chief Sime testified at his deposition that he was approximately 50 to 75 feet

away from Officer Fitch and Mr. Herrera when he heard Officer Fitch say, "Drop the weapon,"

and that he did not "know what was said prior." Doc. 168-3 at 61:1-8, 72:5-10. When asked

whether he ever heard somebody identify themselves as law enforcement, he responds, "I can't

recall at this time," and that, "If I did recall that, it would be in that very first State Police

statement." *Id*. at 70:3-9. When pressed if he heard anything else besides "drop the weapon,"

such as "Police," Mr. Sime testified that "unless it's in that statement, I can't recall." *Id.* at 13-

20; *see also* Doc. 169-3 at 132:18-25 (Sime's deposition where, again, he is asked if he heard

"Angel Fire PD" before "drop the weapon" and he responds, "Honestly, that's a part that unless I

stated it in my State Police statement, I cannot recall at this time"). Plaintiffs did not provide Mr.

Sime's State Police statement during either the current briefing, or in briefing the prior motions for summary judgment (which Plaintiffs incorporate into the present motion). Thus, the record before the Court indicates that Mr. Sime does not know what, if anything, was said prior to when he heard "drop the weapon." That is, although evidence exists that Officer Fitch identified himself before shooting, there is no evidence to support the converse—that Officer Fitch did not identify himself before shooting.

In sum, the Court agrees with Defendants that these witness statements only establish that the witnesses heard Officer Fitch's commands to drop the weapon; they do not establish that Officer Fitch failed to identify himself to Mr. Herrera as a police officer. This leaves as undisputed the affirmative evidence that Officer Fitch identified himself as police after Mr. Herrera asked "who are you?" and "which one?". *See* Doc. 30-2 at 135:10-16, 136:9-12, 137:16-23, 138:20-25, 144:4-7 (Officer Fitch's deposition); Doc. 136-2 ¶ 7 (Officer Fitch's declaration). Further, based on new evidence presented in supplemental briefing, the undisputed facts show that, after identifying himself, Officer Fitch commanded Mr. Herrera, more than once, to drop the knife/weapon before shooting him.

    F.  <u>Time Elapsed Between Warnings and Shooting</u>

Lastly, related to Officer Fitch's identification and warnings, the Court addresses the time that elapsed between the warnings and the shooting. Defendants assert that "the time between Officer Fitch first seeing Mr. Herrera and firing his weapon was 20 to 25 seconds." Doc. 136 at 7 ¶ 25 (citing Officer Fitch's declaration, Doc. 136-2 ¶ 10). Plaintiffs do not dispute this fact,[12] and neither does any evidence in the record.

---

[12] In their response brief, Plaintiffs acknowledge Defendants' statement of fact regarding this time lapse and assert that it, and other factual assertions, are not undisputed and are inconsistent

Angel Fire Fire Department Chief John Murtagh swore in his deposition:

A. So next I turned around and continued doing what I was doing, and I heard
Officer Fitch yell out, Angel Fire Police; drop it; drop the knife; George, drop the
knife, and then I heard a gunshot.
Q. Okay. Do you recall approximately -- approximately how long between
Officer Fitch calling out and the gunshot?
A. I mean, it was a fairly short period of time. It was probably long enough to say
those words. I -- I don't know. Maybe ten seconds or so, ten to --
Q. Would that have been enough --
A.-- twelve seconds.
Q.-- time for Mr. Herrera to comply with the commands, in your opinion?
A. Yes, I think ten seconds on commands like that is enough time for anyone to
obey a law enforcement order.

Doc. 136-9 at 29:13 to 30:8.

At his deposition, Angel Fire Assistant Chief Craig Sime gave the following testimony:

Q. Okay. Then you're looking in that direction, and immediately you hear a
gunshot.
A. Yes.
. . .
Q. You hear, "Drop your weapon."
A. Uh-huh.
Q. You look over there, and then very quickly you hear a gunshot.
A. Uh-huh.
. . .
Q. I think, Mr. Sime, where we left off was you said you heard, "Drop the
weapon," and then an immediate shot. Is that correct?
A. Yes. Yes.

Doc. 168-3 at 68:9-12, 69:4-8, 71:20-24. Later in his deposition, Assistant Chief Sime clarified:

Q. Okay. Okay. I think in your earlier testimony you heard, "Drop the weapon,"
and that the shot was very close to that in time.
A. Define "very close."
Q. I think you said "immediately."
A. I don't think I said "immediately." I heard, "drop the weapon, drop the
weapon," and right afterwards, I can't tell you if it was five seconds, one second,
or three minutes, but – I can tell you it wasn't three minutes, but then I heard the
shot.
Q. Okay.

---

with other evidence in the record. Doc. 150 at 9. Plaintiffs, however, do not state what the other
evidence is and, therefore, fail to meet their burden to show that a factual dispute exists.

A. I can't tell you what the span was between him stating that and the actual shot.
Q. Okay. But you clearly remember, "Drop the weapon."
A. I clearly remember, "Drop the weapon."
Q. Once, perhaps twice.
A. Perhaps twice.
Q. But at least once, because that's what drew your attention to that vicinity.
A. Uh-huh.
Q. And then the shot was very close in time.
A. Yes ma'am. Yes ma'am.

Doc. 169-3 at 151:6 to 152:10.

These statements concern the amount of time that passed between Officer Fitch telling Mr. Herrera to drop the knife and firing a shot. Although the record is not clear as to exactly how much time elapsed, the statements support the undisputed fact that Officer Fitch fired the shot very close in time after commanding Mr. Herrera to drop the knife. As discussed above, it is also undisputed that, at the beginning of his encounter with Mr. Herrera, Office Fitch told Mr. Herrera to drop the knife and then identified himself in response to Mr. Herrera's question "who are you?" before again commanding him, more than once, to drop the knife. Thus, although the record is not clear as to exactly how much time passed between Officer Fitch identifying himself and his shooting Mr. Herrera, it was enough time for Officer Fitch to warn Mr. Herrera, more than once, to drop the knife. And, given that Plaintiffs fail to point to any evidence in the record to dispute Officer Fitch's declaration that the entire encounter lasted 20-25 seconds, the Court accepts that fact as undisputed for the present motion.

## 2. Revised Factual Background

To state the facts under which the Court now conducts its analysis, the Court restates the undisputed material facts from the June 28, 2022 Opinion with the new and revised facts highlighted in bold.

Defendant Mark Fitch, an officer with the Village of Angel Fire Police Department, received a call in the early morning hours of May 5, 2019, alerting him to a house on fire and a sighting of a male walking into the woods. He went to the house and learned that Mr. George Herrera lived there. Officer Fitch knew Mr. Herrera from a previous DWI investigation and court date. Over the course of those previous interactions, Officer Fitch had learned that Mr. Herrera "had had a broken back and had previously been in an oil rig explosion," which led to ongoing mobility limitations that Officer Fitch mentioned to others during his time at the burning house.

Officer Fitch believed that arson was a possibility, but he had no suspects. He determined that no unlawful activity was apparent, so he turned off his lapel camera and left it off for approximately two hours. During this time, he searched around the house to find Mr. Herrera and ensure that he was safe. At approximately 4:50 a.m., while walking near the south side of the small A-frame structure on Mr. Herrera's property, Officer Fitch's flashlight revealed Mr. Herrera about 30 feet away, at the entrance to a horseshoe shaped area.

Officer Fitch saw that Mr. Herrera had a knife with a blade approximately three inches long. Mr. Herrera was holding the knife at his right side. Officer Fitch yelled something to the effect of "George, drop the knife" and drew his sidearm. Mr. Herrera asked who he was and Officer Fitch identified himself as Angel Fire Police. Mr. Herrera asked which one and Officer Fitch said, "Officer Fitch." **Mr. Herrera then began slowly approaching Officer Fitch, still holding the knife, and closing the distance between the two of them. As Mr. Herrera approached, Officer Fitch retreated backwards and commanded Mr. Herrera, more than once, to drop the knife/the weapon.** Although Officer Fitch had his gun pointed at Mr. Herrera, he did not explicitly warn Mr. Herrera that he would shoot Mr. Herrera if Mr. Herrera did not comply with his commands. **Mr. Herrera did not drop the knife and continued advancing.**

**Officer Fitch then shot him. Although the record is not clear as to exactly how much time passed between Officer Fitch identifying himself and shooting Mr. Herrera, it was enough time for Officer Fitch to warn Mr. Herrera, more than once, to drop the knife. At the time of shooting, the distance between the Officer Fitch and Mr. Herrera was not more than 17 feet. The two were in a forested area at night, full of trees, stumps, and debris that created tripping hazards behind and to each side of Office Fitch. A total of 20-25 seconds elapsed during the entire encounter between Mr. Herrera and Officer Fitch (from when Officer Fitch's flashlight first revealed Mr. Herrera to the shooting).**

## LEGAL STANDARD

### 1. Summary Judgment

A party may prevail by summary judgment when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). The moving party has an "initial burden of production" to demonstrate this lack of dispute, and if the moving party meets this standard, "the burden shifts to the nonmoving party to demonstrate a genuine issue." *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002). "[A]n issue of material fact is genuine only if the nonmovant presents facts such that a reasonable [factfinder] could find in favor of the nonmovant." *S.E.C. v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (citation omitted). To be material, the nonmovant's showing must address an element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Thompson*, 732 F.3d at 1156-57.

## 2. Qualified Immunity

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). Qualified immunity protects "officials sued in their personal capacities," as Officer Fitch has been sued in this case. *See Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1264 n.4 (10th Cir. 2009). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that 1) the officer violated a constitutional or statutory right and 2) the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez*, 563 F.3d at 1088. A court may address these prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

A law is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A Supreme Court or Tenth Circuit case on point suffices. *Becker v. Bateman*, 709 F.3d 1019, 1023 (10th Cir. 2013). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 583 U.S. 48, 65 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015).

## ANALYSIS

Plaintiffs' operative complaint brings six claims: (I) battery; (II) negligent hiring, training, and supervision; (III) violation of rights guaranteed by Article II, Section 10 of the New Mexico Constitution; (VI) violation of rights guaranteed by the Fourth Amendment to the United States Constitution; (V) wrongful death; and (VI) loss of consortium. Doc. 1-3. In their renewed motion for summary judgment, Defendants move for summary judgment on the Fourth Amendment claim against Officer Fitch (asserting qualified immunity), as well as summary judgment on the state-law claims.[13] As in its prior Opinion, the Court begins with the question of qualified immunity and with the first prong of qualified immunity—i.e., whether a reasonable jury could conclude Officer Fitch acted unreasonably in using deadly force.

1. **Considering the correction in Officer Fitch's deposition testimony and new evidence both sides have presented, no reasonable jury could find that Officer Fitch's actions were unreasonable under the circumstances.**

Defendants argue Plaintiffs cannot satisfy the first prong of qualified immunity because Officer Fitch's use of deadly force was reasonable; therefore, Officer Fitch did not violate Mr. Herrera's Fourth Amendment rights. In considering this argument, the Court considers the factors set forth in *Graham v. Connor* and resolves all genuine issues of material fact in Plaintiffs' favor. 490 U.S. 386 (1989). In contrast to the conclusion in its previous Opinion, the new information the Court has received tips the balance of the *Graham* factors in Officer Fitch's favor.

---

[13] Also pending before the Court is Defendants' Motion for Partial Summary Judgment as to Count II (negligent hiring, training, and supervision against Angel Fire) and the part of count IV (Fourth Amendment) brought against Angel Fire alleging a policy or custom of Angel Fire caused Plaintiffs' injuries. The Court discusses this motion below, after considering the qualified immunity issue.

The Fourth Amendment protects against unreasonable seizures, including the unreasonable seizure of one's person with excessive force. *See Graham*, 490 U.S. at 396. This test employs an objective standard, assessing the officer's decisions "in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 187 (1978). *Graham* considered "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" as relevant to the totality-of-the-circumstances analysis. 490 U.S. at 396 (citation omitted). The Tenth Circuit adds the "non-exhaustive factors" of "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). All these factors function to guide the Court toward the ultimate question of "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.*

"Thus, at summary judgment, we must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). Or, stated differently, to grant summary judgment to Defendants on the first prong of qualified immunity, the Court must determine that, after resolving all genuine issues of material fact in Plaintiffs' favor, no reasonable jury could draw inferences from the facts indicating that the use of force was excessive in this case. As explained below, the

Court finds that, considering the *Graham* factors and on the evidence before it, no reasonable

jury could find in Plaintiffs' favor on the question of excessive force.

    A.  <u>Officer Fitch's testimony indicates that arson was not "at issue" in this case.</u>

    The first *Graham* factor is the severity of the crime at issue. 490 U.S. at 396. Defendants

make two new arguments as to why this factor should weigh in their favor. Neither is persuasive.

First, Defendants point to Officer Fitch's testimony that he had reasonable suspicion Mr. Herrera

set his car on fire and thereby committed arson.[14] Doc. 136 at 10. Officer Fitch testified that Mr.

Herrera being a male and wearing a cap fitted the description of a person a witness saw walking

away from the car. Doc. 30-2 at 171:22 to 172:14. Even if Officer Fitch did have reasonable

suspicion that Mr. Herrera set his car on fire, however, such suspicion does not necessarily

indicate that Mr. Herrera was involved in a serious crime. And, as Plaintiffs point out, Officer

Fitch repeatedly stated that he was primarily looking for Mr. Herrera out of concern for Mr.

Herrera's safety. *Id.* at 88:21 to 89:2, 117:2-8, 125:2-16, 142:18-20, 173:4-11, 219:6-9. As the

Court noted in its previous order, "Although Officer Fitch considered the possibility of arson, he

also testified that he did not have a suspect in mind and that his efforts to search for Mr. Herrera

were for the purpose of ensuring Mr. Herrera's safety." Doc. 40 at 7 (citing Doc. 30-2 at 173:4-

11, 219:2-4). Officer Fitch's testimony does not indicate that he intended to arrest Mr. Herrera

for arson, that he had probable cause to do so, or that he even *thought* he had probable cause to

do so. He recognized only the possibility of arson, had no suspect, and was not searching for Mr.

Herrera with the intent to apprehend him. *See Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir.

2016) ("That the officers were performing a welfare check, and that they were not looking for

---

[14] The parties do not brief whether a person who sets his own property on fire with no fraudulent intent, and without harming anyone else's property, can be guilty of arson. Therefore, the Court does not further analyze this question.

[decedent] because they suspected he had committed a crime prior to finding him, weighs heavily against the use of significant force."); *Myers v. Brewer*, 773 F. App'x 1032, 1037 (10th Cir. 2019) (no crime at issue when police received a call that decedent was standing in front of a bar with a gun); *cf. Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (factor slightly favors officer because officer believed he had probable cause to arrest suspect for assault, even though he did not).

Second, Defendants argue that, in approaching Officer Fitch, Mr. Herrera committed the crime of aggravated assault on a police officer. Doc. 136 at 10-11. Although Mr. Herrera might have committed this crime during the course of his interaction with Officer Fitch, it was not a crime that Officer Fitch was investigating before his interaction with Mr. Herrera. Although evidence Mr. Herrera threatened Officer Fitch is relevant, it is not relevant to this *Graham* factor. Thus, the first *Graham* factor continues to weigh in Plaintiffs' favor.

B. Officer Fitch reasonably perceived Mr. Herrera as presenting a deadly threat and no reasonable jury could find otherwise.

Defendants' argument that Mr. Herrera was committing the crime of aggravated assault on Officer Fitch at the time of the shooting is more appropriately analyzed under the second *Graham* factor. The second *Graham* factor is the level of immediate threat to the safety of the officer or others. 490 U.S. at 396. To understand the second *Graham* factor in more depth, courts consider the *Larsen* factors. *See, e.g.*, *Est. of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020); *Simpson v. Little*, 16 F.4th 1353, 1361 (10th Cir. 2021). The *Larsen* factors aim to "evaluat[e] the degree of threat perceived by the officer." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 765 (10th Cir. 2021). Therefore, as before, the Court will employ the *Larsen* factors in its analysis of the second *Graham* factor.

      *i.*  *Officer Fitch repeatedly commanded Mr. Herrera to stop and drop his knife,*
         *including after Officer Fitch identified himself as a police officer.*

The first *Larsen* factor is whether the police ordered the suspect to drop his weapon and

whether the suspect complied with those commands. 511 F.3d at 1260. As noted in the Court's

previous Opinion, Officer Fitch's lapel camera was turned off for most of the interaction

between Officer Fitch and Mr. Herrera. Officer Fitch asserts that he identified himself as law

enforcement by name and that he ordered Mr. Herrera to drop the knife at least three times

before shooting him. Doc. 30-2 at 146:11. At the time of the Court's previous Opinion, however,

the Court had not been advised of the correction to Officer Fitch's deposition transcript (that

Officer Fitch testified he "did", as opposed to "didn't", command Mr. Herrera to stop and drop

his knife after Officer Fitch identified himself as a police officer and by name). Further, the

Court was left with the impression that Officer Fitch was the only living witness to his encounter

with Mr. Herrera. *See, e.g.*, Docs. 20, 29, 32 (briefing on prior motion for summary judgment, in

which both sides cite only Officer Fitch's testimony as to the encounter with Mr. Herrera); Doc.

20 at 4 ¶ 14 & Doc. 29 at 5 ¶ 14 (in response to Defendants' undisputed material fact that

"Defendant Fitch repeatedly told [Mr. Herrera] to stop and drop the knife, but Mr. Herrera

continued to advance on [Officer] Fitch," Plaintiffs' assertion that "Fitch was the only witness to

this conversation").

      Based on the information it had at the time, the Court compared the warning given in this

case to the warning given in *Tenorio v. Pitzer*, 802 F.3d 1160, 1164-65 (10th Cir. 2015). *Tenorio*

involved a situation where a man with a knife (Tenorio) walked toward police, a police officer

commanded Tenorio to drop the knife and, when Tenorio did not immediately do so, shot the

man. 802 F.3d at 1163. The commands and the shooting lasted two or three seconds. *Id*. In

denying the officer qualified immunity, the district court acknowledged that the officer

commanded Tenorio to drop the knife. *Id*. at 1163-64. It concluded, however, that "Tenorio did not refuse to comply with the command to drop the knife but was instead given insufficient time to do so . . ." *Id*. In affirming the district court, the Tenth Circuit appeared to accept this conclusion. *See id*. at 1165 (stating the court felt "comfortable that the evidence, viewed in this light, suffices for Tenorio's claims"). That is, it appears the Tenth Circuit agreed with the district court's conclusion that, because the officer did not give Tenorio sufficient time to comply with his command, despite the command, this factor weighed against, not for, the officer.

In its original Opinion, the Court distinguished between commands Officer Fitch gave before identifying himself as a police officer and commands Officer Fitch gave after identifying himself as a police officer. That is because a reasonable jury could conclude that, before Officer Fitch identified himself, Mr. Herrera would not have understood that a police officer was giving him commands. It was in the middle of the night, Mr. Herrera was on his own property, his house and car had just burned down, and now someone on his property was shining a flashlight in his face and yelling at him to drop his knife. Doc. 40 at 9. Any reasonable officer would recognize that, under these circumstances, it was reasonable for Mr. Herrera to resist dropping his knife until he determined the identity of the person who was yelling at him. Indeed, when Officer Fitch first told Mr. Herrera to drop his knife, Mr. Herrera reacted by asking, "Who are you?" and after Officer Fitch identified himself as Angel Fire police, Mr. Herrera asked, "No, which one?" Doc. 30-2 at 137:19-22.

Further, according to the incorrect transcript provided to the Court, Officer Fitch admitted that, after he identified himself, he gave Mr. Herrera no further warnings. And, the Court had no evidence regarding how much time transpired after Officer Fitch identified himself. Drawing all reasonable inferences in favor of Plaintiffs a reasonable jury could conclude that, without further

46

warning, Officer Fitch shot Mr. Herrera immediately after identifying himself. The Court thus found the circumstances similar to those in *Tenorio* and concluded, "on the current record, a reasonable jury could find that a reasonable officer in Officer Fitch's position should have realized that Mr. Herrera's noncompliance was due to Mr. Herrera not understanding that he was confronted by a police officer giving him commands to drop his weapon, rather than constituting a hostile refusal to comply with those commands." Doc. 40 at 9-10.

The new information changes this analysis. Officer Fitch's deposition testimony makes clear that, after he identified himself as a police officer and by name, he warned Mr. Herrera, three or four times, to stop and drop his knife. Defendants have also provided new information in the form of deposition testimony from Fire Department Chief Murtagh. Chief Murtagh testified, "I heard Officer Fitch yell out 'Angel Fire Police; drop it; drop the knife; George, drop the knife,' and then I heard a gunshot." Doc. 136-9 at 29:14-16. Likewise, EMTs Wayne Jenkins and David Varela provided statements that they observed Officer Fitch backing up and shouting multiple commands to drop the weapon at Mr. Herrera. Docs. 136-7, 136-8.

In contrast, taking Officer Fitch's uncorrected deposition transcript out of the equation, Plaintiffs present no evidence that, after identifying himself as a police officer, Officer Fitch failed to warn Mr. Herrera to drop the knife. To the contrary, Plaintiffs submitted new statements from witnesses who heard and saw Officer Fitch yelling commands to drop the knife/weapon right before hearing a shot. *See* Doc. 168-1 (Fire Chief of the Eagle Nest Volunteer Fire Department Thomas Scott Gibson's declaration); 168-2 (Angel Fire Firefighter John W. Murtagh, Jr.'s affidavit); 168-3 (Angel Fire Assistant Fire Chief Craig Sime's deposition testimony); 168-4 (Firefighter Tucker Cottam's deposition). And although these witnesses did not hear Officer Fitch identify himself as police before giving the command to drop the knife,

they all indicated that they did not hear the entire interaction between Officer Fitch and Mr. Herrera.

Further, given the lapel video evidence, it is undisputed that Mr. Herrera did not drop the knife in response to the commands Officer Fitch gave. *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 765 (10th Cir. 2021) (the first *Larson* factor considers "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands") (internal quotation marks and citation omitted). Thus, drawing all reasonable inferences in favor of Plaintiffs, the undisputed evidence in the record indicates that, although the record is not clear as to exactly how much time passed between Officer Fitch identifying himself and his shooting Mr. Herrera, it was enough time for Officer Fitch to warn Mr. Herrera, more than once, to drop the knife.

In its previous Opinion, the court also noted that "Officer Fitch testified that he did not give a more specific command such as 'drop the knife or I will shoot.'" Doc. 40 at 9 (citing Doc. 30-2 at 152:5-10). This remains true.[15] Nonetheless, although a more specific command might have been better, the Court recognizes that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Graham*, 490 U.S. at 396–397). The Tenth Circuit has also recently, repeatedly, "held the warning does not need to be specifically that officers are about to open fire." *Est. of George v.*

---

[15] Officer Fitch did have his gun drawn and aimed at Mr. Herrera. Drawing all reasonable inferences in Mr. Herrera's favor, however, Mr. Herrera may not have been able to see the gun because Officer Fitch had his flashlight shining in Mr. Herrera's face. The Court, therefore, does not factor the drawn gun into its analysis of the warning Officer Fitch gave.

*City of Rifle, Colorado*, 85 F.4th 1300 (10th Cir. 2023) (quoting *Palacios v. Fortuna*, 61 F.4th 1248, 1249 (10th Cir. 2023)).

All evidence in the record demonstrates that, before shooting Mr. Herrera, Officer Fitch warned Mr. Herrera to drop his knife multiple times, including more than one warning after Officer Fitch identified himself as a police officer and by name. Mr. Herrera did not drop the knife and, although it is not clear exactly how much time passed between the warning and the shooting, it was enough time for Officer Fitch to warn Mr. Herrera, more than once, to drop the knife. No evidence exists that Mr. Herrera had insufficient time to comply with Officer Fitch's commands. As a result, consideration of this factor weighs in favor of Officer Fitch.

> ii.  *Mr. Herrera's act of continuing to advance on a retreating Officer Fitch, even after Officer Fitch identified himself as a police officer and commanded Mr. Herrera to stop and drop the knife, constitutes a hostile motion.*

The second *Larsen* factor is whether the suspect made any hostile motions. 511 F.3d at 1260. In its previous Opinion, the Court found that "at the moment of the shooting, Mr. Herrera is not holding the knife in an attacking position." Doc. 40 at 10. Defendants now rely on expert testimony to argue that, even though Mr. Herrera was holding the knife at his side, he "could have easily made upward thrusts to vulnerable areas which could defeat an officer's body-armor." Doc. 136 at 5 ¶ 13. As discussed above, the Court does not consider this expert testimony when determining the undisputed material facts.

The Court notes, however, that Defendants' expert essentially repeats an argument Defendants made in their original motion. There, Defendants similarly characterized Mr. Herrera as "holding [the knife] in a manner that he could easily stab someone," or "a ready position," respectively. Doc. 40 at 10 (citing Doc. 30-2 at 207:25, 208:1; Doc. 20 at 9). The Court acknowledged, as Defendants previously and currently argue, that "Mr. Herrera could have

quickly moved the knife from his side to an attacking position . . ." *Id.* Nonetheless, the Court

also pointed out that Mr. Herrera

> did not hold the knife in the same aggressive, threatening manner as the decedent
> in *Larsen*. There, the decedent "raised the knife above his shoulder with the blade
> pointed outward and turned towards" an officer, then took a step toward that
> officer. 511 F.3d at 1258. Mr. Herrera did not move the blade from its position
> near his thigh, nor did he run toward Officer Fitch or act erratically. Doc. 30-2 at
> 139:2-8, 147:16-19, 152:13-18. Simply advancing with a blade held at one's side
> is not necessarily a hostile motion. *See Tenorio*, 802 F.3d at 1166; *Zuchel v. City
> & Cnty. of Denver, Colo.*, 997 F.2d 730, 736 (10th Cir. 1993).

*Id.* at 10-11.

Accepting Defendants' argument does not alter this conclusion. Of course, Mr. Herrera's

possession of a knife with a three-inch blade makes him a greater threat than if he had no weapon

at all. And, of course, a man holding a knife at his side can thrust that knife forward. These facts

make Mr. Herrera more of a threat than an unarmed man and his possession of a weapon factors

into the *Graham* analysis.

It does not factor into analysis of the second *Larsen* factor, however, which focuses on

motion. No evidence exists that Mr. Herrera made any hostile motion with the knife. And,

contrary to Defendants' attempt to discount the importance of the manner in which a person

wields a knife, the Tenth Circuit has found the manner a knife is wielded to be extremely

important. *See Tenorio*, 802 F.3d at 1164 (accepting the district court's finding "that Tenorio

made no hostile motions toward the officers but was merely 'holding a small kitchen knife

loosely by his thigh and . . . made no threatening gestures toward anyone'"). Mr. Herrera's

motion (or, more accurately, lack of motion) with the knife does not evince hostility.

What Mr. Herrera did or did not do with the knife, however, is not the only motion the

Court must consider. Mr. Herrera continued to advance on a retreating Officer Fitch even after

Officer Fitch commanded him to stop and drop the knife. This motion does evince hostility. *See*

*Larsen*, 511 F.3d at 1263 (finding as hostile action toward the shooting officer that "Larsen ignored at least four police commands to drop his weapon"). When Officer Fitch encountered Mr. Herrera, he directed the beam of his flashlight into Mr. Herrera's face, he identified himself as a police officer, he yelled for Mr. Herrera to stop and to drop his knife and, as Officer Fitch backed up to keep space between him and Mr. Herrera, Mr. Herrera ignored Officer Fitch's commands and continued to advance, knife in hand, closing the distance between the two. Under these circumstances, the Court concludes that Mr. Herrera's motion of advancing on a retreating Officer Fitch was hostile.

Although the Court also had evidence that Mr. Herrera walked toward Officer Fitch with knife in hand when it issued its first Opinion, it did not have evidence that Mr. Herrera continued to advance on Officer Fitch as Officer Fitch warned Mr. Herrera, after identifying himself as a police officer, to stop and drop the knife. Nor did the Court consider evidence that Officer Fitch was retreating at this time. Although a reasonable jury could conclude that it would not be hostile for a property owner whose house had just burned down to walk toward a man on his property, even if he had a knife at his side, a reasonable jury could not draw the same conclusion in the face of evidence that the man on his property was a police officer who was yelling at him to stop and drop the knife, and attempting to create distance between the two.

  iii. *The distance between Mr. Herrera and Officer Fitch justified the use of deadly force.*

The third *Larsen* factor is the distance separating the officers and the suspect. 511 F.3d at 1260. As noted above, drawing all reasonable inferences in favor of Plaintiffs, a reasonable jury could conclude that as much as 17 feet separated Officer Fitch and Mr. Herrera at the time of the shooting. Further, as noted in its previous Opinion, "because a knife wielder can often quickly close a twenty-foot distance, this distance has been found to support an officer's use of deadly

51

force when combined with other circumstances." Doc. 40 at 11 (citing *Larsen*, 511 F.3d at 1261-62). Indeed, in *Larsen,* drawing all inferences in favor of Larsen, the knife-wielder, he was approximately the same distance from the officer in that case as Mr. Herrera was from Officer Fitch in this case, which the *Larsen* court found to contribute to the totality of circumstances justifying the use of force. 511 F.3d at 1262 & n.2 ("For purposes of summary judgment, the district court accepted a range of 15 to 20 feet . . . the outer range accepted by the court is generous"). The Court's finding that a reasonable jury could find, at most, a distance of 17 feet separated the two, is close to the assumption in the Court's previous Opinion that 20 feet separated the two. This narrowing of 3 feet would not alone change the Court's analysis of this factor.

More important than this three-feet reduction, however, is undisputed evidence that Officer Fitch was retreating by walking backwards at night, with his focus (and flashlight) on the approaching Mr. Herrera rather than on where he was stepping, in a dark forest full of tripping hazards, as Mr. Herrera closed the distance between them. Although Plaintiffs argue that Officer Fitch had room to his left and right to move, the relevant question is not whether it would have been possible for Officer Fitch to have escaped to his left or right, or back the way he came. Instead, the relevant question is whether a reasonable jury could find that it was objectively unreasonable for Officer Fitch to conclude that he could not safely place more distance between himself and Mr. Herrera by moving to the left, right, or back the way he came under the circumstances in which he found himself. And, in making this assessment, the "'reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Larsen*, 511 F.3d at 1259 (quoting *Graham,* 490 U.S. at 397). "Moreover, because 'police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.'" *Id.* at 1259-60 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001), which quoted *Graham,* 490 U.S. at 396). The advancing Mr. Herrera presented a danger to the retreating Officer Fitch, who, as every reasonable jury would have to conclude, reasonably believed he could not safely divert his focus and flashlight from the approaching Mr. Herrera in order to escape to his left, right, or back the way he came, thereby placing more distance between the two. Given this danger, Officer Fitch did not have to wait for Mr. Herrera to further close the gap, or risk tripping and falling, which would leave him more susceptible to an attack. *See id.* at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often too late to take safety precautions.").

Further, *Larsen* instructed that "while distance is one factor in assessing the immediacy of threat, it is not the only one. In this case, the question of distance is unpersuasive when we consider the other undisputed facts in their totality." *Id.* at 1262. Likewise, the Tenth Circuit said where a case presents facts "significantly different than *Larsen*, we conclude that we must modify the physical distance factor to take into account other considerations relevant to this case." *Est. of George v. City of Rifle, Colorado*, 85 F.4th 1300, 1318 (10th Cir. 2023). In *George*, for instance, the Tenth Circuit concluded an officer acted reasonably when he shot a man he had had reason to believe was dangerous—even though the man was running away from officers. *Id.* at 1320. This is due to the particular circumstances of that case: the man was running toward a town, carrying a gun, and had ignored officers' repeated commands to drop the gun. *Id.* at 1318. Here, the facts involve an officer trying to retreat at night in a forest full of tripping hazards

while Mr. Herrera closed the distance between himself and Officer Fitch. When an officer is moving backwards in such a situation, 17 feet provides less of a safety cushion than it would if neither man were moving, the ground was clear and even, and the lighting was good.

True, earlier that night Officer Fitch speculated that Mr. Herrera's physical disability was severe enough to prevent Mr. Herrera from being able to climb into the back of a pickup. *See* Doc. 29 at 14; Doc. 30-1 at 1:45; Doc. 30-2 at 106:21-25, 107:1. This disability factored into the Court's analysis of the threat Mr. Herrera posed when he presumably was at a distance of 20 feet from an unmoving Officer Fitch who had his sights on Mr. Herrera. Under the different circumstances now presented, however, evidence of Mr. Herrera's physical disability cannot continue to tip the scales in his favor when evaluating this factor. To the contrary, considering the newly presented evidence, this factor weighs in Defendants' favor.

> iv. *Based on the newly-provided evidence, a reasonable jury could only conclude that Mr. Herrera manifested an intent to harm Officer Fitch.*

The fourth *Larsen* factor is the manifest intentions of the suspect. 511 F.3d at 1260. Analysis of this factor overlaps with the Court's analysis of the second *Larsen* factor (whether Mr. Herrera made hostile movements). In its earlier Opinion, the Court acknowledged that a reasonable jury could go either way on this factor. The Court began its analysis by noting that "simply moving forward while holding a blade at one's side does not automatically establish hostility as a matter of law." Doc. 40 at 13. A knife of course, can be used as a tool as well as a weapon and abundant scenarios exist where a person might happen to be holding a knife as a tool at the time of a police encounter. Based on the evidence, and lack of evidence, presented at the time of the Court's earlier Opinion, a reasonable jury could conclude that Mr. Herrera, who was on his own property, did not manifest an intent to harm Officer Fitch, but simply asked the man

who was shining a light in his face to identify himself and Officer Fitch's response was to identify himself and then shoot Mr. Herrera.

On the other hand, the Court noted in its previous Opinion that, based on the evidence presented, a reasonable jury could have found Officer Fitch acted reasonably given he "was faced with a fire of unknown origin, Mr. Herrera's mysterious absence for two hours, Mr. Herrera's unexpected emergence from a small structure in the woods in the middle of the night, Mr. Herrera's possession of a knife, and Mr. Herrera's continuing advancement toward Officer Fitch even after Officer Fitch had identified himself as a police officer and told Mr. Herrera to drop the knife." Doc. 40 at 13 n.5. Nonetheless, because a reasonable jury could also accept Plaintiffs' narrative, the Court held that this factor weighs in Plaintiffs' favor.

In light of the new evidence presented, the Court no longer believes a jury could accept Plaintiffs' narrative. Evidence that Mr. Herrera continued to advance on a retreating Officer Fitch, even after Officer Fitch identified himself as a police officer and ordered Mr. Herrera, more than once, to stop and drop the knife after identifying himself, belies the notion that "Mr. Herrera simply advanced while holding a blade at his side, which is not necessarily a manifestation of hostility." Doc. 40 at 13. Even if Mr. Herrera was confused, Officer Fitch also reasonably considered him to be dangerous under these circumstances.

> *v.   A jury could find that Officer Fitch was not a threat to others.*

Based primarily on new evidence that the EMTs were within 15 feet of Officer Fitch at the time of the incident, Defendants renew their argument that Mr. Herrera presented a threat to others on the scene. As an initial matter, the Court notes that, in considering the danger Mr. Herrera presented to the EMTs, the distance between the EMTs and Mr. Herrera is more relevant than the distance between the EMTs and Officer Fitch. The record does not indicate how far the

EMTs were from Mr. Herrera at the time of the encounter. Drawing all reasonable inferences in Plaintiffs' favor, if Mr. Herrera was 17 feet from Officer Fitch and the EMTs were 15 feet from Officer Fitch, the EMTs could have been as much as 32 feet from Mr. Herrera.

More significantly, the Court adopts its analysis from its previous Opinion. The evidence indicates that Mr. Herrera's singular focus was on Officer Fitch, toward whom he was advancing. For the same reasons articulated in its previous Opinion, the Court rejects Defendants' argument that Mr. Herrera presented an objective threat to others on the scene. *See* Doc. 40 at 13-14.

      C.  <u>Mr. Herrera was not resisting or evading arrest.</u>

The third *Graham* factor is whether the victim was resisting or evading arrest. 490 U.S. at 396. In support of this factor, Defendants' essentially repeat the same arguments they made with regard to the first *Graham* factor (severity of crime at issue). Doc. 17-18. The Court rejects these arguments for the same reasons the Court rejected the same arguments in its analysis of the first *Graham* factor. Mr. Herrera was not under arrest and no probable cause existed that he had committed a crime. *See* Doc. 29 at 15. Because Mr. Herrera was not resisting or evading arrest, this factor weighs in Plaintiffs' favor.

      D.  <u>The new evidence provided distinguishes this case from *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015).</u>

In its previous Opinion, the Court compared facts in this case to those in *Tenorio*. As a reminder, the Tenth Circuit in *Tenorio* recognized some facts in that case that supported the use of deadly force: "The officers were responding to an emergency call for police assistance to protect against danger from a man who had been violent in the past and was waving a knife around in his home. The man was walking toward [the police officer] in a moderate-sized room while still carrying the knife despite repeated orders to drop it." 802 F.3d at 1164. However, "the

district court ruled that the record supports some potential jury findings that would establish Tenorio's claim": (1) Tenorio did not refuse to comply with the command to drop the knife but was instead given insufficient time to do so; (2) Tenorio made no hostile motions towards the officers or anyone else and merely held the knife loosely by his thigh; (3) Tenorio was shot before he was within "striking distance" of the officers; and (4) for all the officers knew, Tenorio was a threat only to himself. *Id.* at 1164-65. The majority felt "comfortable that the evidence, viewed in this light, suffices for Tenorio's claims." *Id.* at 1165.

In contrast, before shooting Mr. Herrera, Officer Fitch identified himself and then gave Mr. Herrera multiple warnings to drop the knife. Thus, unlike the officer in *Tenorio*, any reasonable jury would have to conclude that Officer Fitch gave Mr. Herrera sufficient time to drop his knife.

On the second point, it is true that both Mr. Tenorio and Mr. Herrera walked toward police officers while carrying a knife by their thigh. However, Mr. Herrera's decision to continue to advance toward a retreating Officer Fitch, and to begin to close the gap between the two, even though Officer Fitch repeatedly ordered him to stop and drop the knife evinces hostility not present in *Tenorio*.

Third, it is true that Officer Fitch and Mr. Herrera were as much as 17 feet apart at the time of the shooting and, under some circumstances, a jury could conclude 17 feet to be outside a zone of danger that could justify the use of deadly force. Such theoretical circumstances, however, do not exist in this case. Here, Mr. Herrera was advancing on Officer Fitch, closing the gap between the two, while Officer Fitch retreated backwards at night, in a forested area surrounded by debris and other tripping hazards. These circumstances shorten, rather than expand, the zone of danger a knife-wielder typically presents to a police officer.

Regarding the district court's fourth point, this case is like *Tenorio*: for all Officer Fitch knew, Mr. Herrera was no danger to others. On balance, however, the new evidence presented indicates that the considerations the district court in *Tenorio* relied on in denying the police officer's qualified immunity motion do not exist in the present case.

Further, although Mr. Herrera did not charge Officer Fitch and made no "slicing or stabbing" motions with his knife, he manifested hostility by continuing to advance on a retreating Officer Fitch, all while ignoring Officer Fitch's commands to stop and drop the knife. Under these circumstances the Court cannot conclude, as it did in its earlier Opinion, that "a reasonable jury could find that Mr. Herrera was noncompliant solely due to confusion, which would have been apparent to a reasonable officer; that he was evincing no hostility through gestures or otherwise; that he was outside 'striking distance' . . . and that he was not a danger." Doc. 40 at 17.

E. On balance, the *Graham* factors, the *Larsen* factors, and the differences from *Tenorio* support a finding that Officer Fitch acted reasonably.

In sum, the Court finds that *Graham* factors one (severity of the crime) and three (resisting arrest) weigh in Plaintiffs' favor, as does the issue of whether Mr. Herrera was a threat to others. However, *Graham* factor two (threat to the safety of the officer), as analyzed through the *Larsen* factors, weighs in favor of Officer Fitch. Looking at the totality of circumstances, the Court finds, as to the first prong of qualified immunity, no reasonable jury could find that Officer Fitch's actions were unreasonable. *See, e.g.*, *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 764 (10th Cir. 2021) ("Despite the likely low-level of the crime under investigation (if a crime at all) and the lack of a reasonable basis to arrest Mr. Taylor (or intent to do so), the totality of the circumstances indicates that—by the time Officer Cruz discharged his gun—he reasonably perceived that Mr. Taylor posed an immediate, mortal threat to his safety or the safety of others.

More specifically, *Graham*'s second factor weighs heavily in Defendants' favor and is determinative."); *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) ("The threat to the officers themselves—if actual and imminent—could of course shift the calculus in the direction of reasonableness."). Said another way, based on the new evidence the parties present, the Court finds that Mr. Herrera presented a deadly threat to Officer Fitch and any reasonable jury would have to conclude that Officer Fitch acted reasonably when he shot Mr. Herrera. The Court, thus, finds that no constitutional violation occurred.

**2. No clearly established law would have put a reasonable officer on notice that, under the new facts presented by the parties, the use of lethal force would be unreasonable.**

Moving to the next prong of qualified immunity, Plaintiffs must show that the constitutional right they claim Officer Fitch violated was clearly established at the time of the alleged violation. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez*, 563 F.3d at 1088. The Court previously determined, "*Tenorio* governs this case because a reasonable jury could find that Mr. Herrera was noncompliant solely due to lack of opportunity or ability to comply; that he was evincing no hostility through gestures or otherwise; that he was outside 'striking distance'; that he was not charging the officer; and that he held a knife only loosely at his side making no slicing or stabbing motions." Doc. 40 at 19. As set forth above, new information distinguishes this case from *Tenorio*. Specifically, new evidence demonstrates Mr. Herrera continued to advance on Officer Fitch even as Officer Fitch was retreating and after Officer Fitch repeatedly warned Mr. Herrera to stop and drop the knife. Mr. Herrera was closing the gap between himself and Officer Fitch and Officer Fitch faced a risk of tripping as he backed up at night in a forested area. When Mr. Herrera was within 17 feet of the retreating Officer Fitch, Officer Fitch shot him. *Tenorio* fails to place every reasonable officer on notice that deadly force in these circumstances would be unconstitutional. *See City of Tahlequah, Oklahoma*

59

*v. Bond*, 595 U.S. 9, 12 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.").

Given that *Tenorio* fails to provide clearly established law when applied to this new fact pattern, the Court reviews other relevant cases and find that, likewise, none supply clearly established law given the new facts of the present case.

A. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018)

In its June 28, 2022 Opinion, the Court also cited *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018), but concluded "that *Kisela* does not overturn *Tenorio* and therefore would not change the outcome of the current decision." Doc. 40 at 19 n.8. Because the new evidence Defendants present distinguishes *Tenorio*, however, *Kisela* becomes more relevant. Thus, even though the parties did not discuss *Kisela* in either motion for summary judgment, the Court considers it now.

Three years after *Tenorio*, the Supreme Court issued its decision in *Kisela*, making clear that no Supreme Court precedent exists to establish that deadly force is unreasonable when a knife-wielder neither charges anyone nor holds the knife in a menacing manner. In *Kisela*, police responded to a 911 call that a woman was hacking a tree with a kitchen knife and acting erratically. 138 S.Ct. at 1150. When police arrived, they saw a woman (Sharon Chadwick) standing next to a car in the driveway of a house. *Id*. at 1151. Another woman (Amy Hughes) then came out of the house carrying a large kitchen knife at her side. *Id*. Hughes, who matched the description of the woman hacking at the tree, walked toward Chadwick and stopped 6 feet from her. *Id*. Although the officers themselves were not in immediate danger because a chain-link fence separated them from Chadwick, all three officers drew their guns. *Id*. At least twice they told Hughes to drop the knife. *Id*. Chadwick told both Hughes and the officers to "take it

60

easy." *Id*. "Hughes appeared calm, but she did not acknowledge the officers' presence or drop

the knife." *Id*. One of the officers then shot Hughes four times. *Id*.

In dissent, Justice Sotomayor summarized the facts of *Kisela* at the time of the shooting

as follows:

> Hughes stood stationary about six feet away from Chadwick, appeared
> "composed and content," and held a kitchen knife down at her side with the blade
> facing away from Chadwick. Hughes was nowhere near the officers, had
> committed no illegal act, was suspected of no crime, and did not raise the knife in
> the direction of Chadwick or anyone else. Faced with these facts, the two other
> responding officers held their fire, and one testified that he "wanted to continue
> trying verbal command[s] and see if that would work." But not Kisela. He thought
> it necessary to use deadly force, and so, without giving a warning that he would
> open fire, he shot Hughes four times, leaving her seriously injured.

*Id*. at 1155 (Sotomayor, J. dissenting) (internal citations omitted). Justice Sotomayor later

elaborated that Hughes "held the kitchen knife down at her side with the blade pointed away

from Chadwick" and that the officers' two commands for Hughes to drop the knife "came in

quick succession." *Id*. at 1156 (internal quotations and citations omitted). Indeed, Justice

Sotomayor noted, "The evidence in the record suggests that Hughes may not have heard or

understood the officers' commands and may not have been aware of the officers' presence at

all." *Id*. Justice Sotomayor complained that "[w]ithout giving any advance warning that he would

shoot, and without attempting less dangerous methods to deescalate the situation, [the officer]

dropped to the ground and shot four times at Hughes (who was stationary) through a chain-link

fence." *Id*.

Bypassing the first prong of a qualified immunity analysis, the majority of the Supreme

Court concluded at the second prong of the analysis, "This is far from an obvious case in which

any competent officer would have known that shooting Hughes to protect Chadwick would

violate the Fourth Amendment." *Id*. at 1153. *Kisela* has many similarities to the present case.

Both cases involved a person carrying a knife at their side. In both cases, police commanded the person to drop the knife and the person ignored those commands. In both cases, the knife-holder appeared calm. In both cases, officers suspected the knife-wielder of no crime and gave no explicit warning that they were about to open fire.

There are, however, also some differences between *Kisela* and the present case. Drawing all inferences in favor of Plaintiffs, the knife-wielder in *Kisela* was closer to the endangered person than the knife wielder (Mr. Herrera) in the present case. Even so, the officer in *Kisela* was not faced with the possibility of having to fire a shot while backing up in a forest or possibly tripping while backing up as the knife-wielder ignored commands and continued to advance. That is, the danger of tripping Officer Fitch faced and the possibility of needing to fire a shot while he and Mr. Herrera were both moving expanded the zone of danger between Officer Fitch and Mr. Herrera beyond what it would be if Officer Fitch was able to maintain his sights on Mr. Herrera from a stable, standing position. *Compare id*. at 1155, 1156 (Justice Sotomayor, in dissent, twice stressing that the woman shot in *Kisela* was "stationary").

Officers in *Kisela* also had information that Hughes had been acting erratically (although there is no evidence that the officers themselves saw Hughes act erratically). In contrast, Officer Fitch had no similar information about Mr. Herrera. However, Officer Fitch encountered Mr. Herrera at 4:30 am when Mr. Herrera suddenly came out of the forest after having been mysteriously absent for the past two hours. When Officer Fitch commanded Mr. Herrera to stop and drop the knife, Mr. Herrera continued to advance on him, even as Officer Fitch retreated. Officer Fitch then, had *first-hand* information that Mr. Herrera was engaging in abnormal behavior.

At a minimum, what *Kisela* establishes is that no Supreme Court case exists to put officers on notice that deadly force can never be used on a knife-wielder who does not wave the knife in a menacing manner or charge anyone. Because *Kisela* involved an appeal from the Ninth Circuit, however, the Supreme Court had no occasion to analyze whether Tenth Circuit precedent existed to put the officer on notice that his conduct was unconstitutional.

B. *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9 (2021)

The Supreme Court case of *City of Tahlequah, Oklahoma v. Bond*, however, did arise out of the Tenth Circuit. 595 U.S. 9, 11 (2021). There, a woman called the police, explaining that her ex-husband was intoxicated and would not leave her garage. *Id.* at 10. When officers arrived, they went to the side entrance of the garage and began speaking with the ex-husband in the doorway. *Id.* After the ex-husband refused a pat down, one officer stepped toward the ex-husband, causing the ex-husband to take one step back. *Id.* The ex-husband then turned around and walked to the back of the garage, with the officers following behind. *Id.* The ex-husband grabbed a hammer from the back wall and turned around to face the officers. *Id.* at 11. No officer was within six feet of the ex-husband. *Id.* The ex-husband grasped the hammer with both hands, as if preparing to swing, and pulled the hammer to shoulder level. *Id.* The officers backed up, drawing their guns, and yelled to drop the hammer. *Id.* The ex-husband did not, but instead took a few steps to his right, coming out from behind a piece of furniture to gain an unobstructed path to one officer. *Id.* He raised the hammer higher and took a stance as if to throw it; in response, two officers fired, killing him. *Id.* Finding a lack of clearly established law, the Supreme Court reversed the Tenth Circuit's decision to deny qualified immunity to the police officer.

In rejecting Officer Fitch's initial assertion of qualified immunity, the Court addressed and distinguished *Bond*: "unlike the situation in *Bond* where the ex-husband held a hammer like

a baseball bat and raised it as if he was going to throw it, Mr. Herrera held a knife down at his side and made no stabbing or slashing motions." Doc. 40 at 20. This remains a distinguishing factor even considering the new evidence Defendants presented. As with *Kisela*, however, the Supreme Court did not address whether the use of deadly force was constitutional and so *Bond* provides little guidance regarding that inquiry. Instead, *Bond* provides guidance on the second prong of a qualified immunity analysis: looking at Tenth Circuit and Supreme Court precedent, what notice is clearly provided to police officers? *See id.* ("The greater relevance of *Bond* is found in its admonition to lower courts regarding the second qualified immunity prong.").

As noted in its previous Opinion, in reversing the Tenth Circuit, the Supreme Court stated:

> We have repeatedly told courts not to define clearly established law at too high a level of generality. *See*, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12, (2015) (per curiam) (internal quotation marks omitted).

*Bond*, 595 U.S. at 12 (citation styles altered). This admonition, as the Court explained in its previous Opinion, "lends support to Judge Phillips' dissenting argument that the *Tenorio* majority spoke too generally when it held that a police officer is not entitled to summary judgment when a knife-wielder advances on, but does not charge, a police officer and makes no slashing or stabbing motions with the knife." Doc. 40 at 20. Despite this, however, the Court recognized in its prior Opinion, "*Tenorio* remains the law in the Tenth Circuit and it is for the

Tenth Circuit, not this court, to depart from its own precedents in light of Supreme Court decisions." *Id.* at 21.

That is, when all evidence previously presented was viewed in the light most favorable to Plaintiffs, the similarities between *Tenorio* and the present case were sufficient to place any reasonable officer on notice that Officer Fitch's use of deadly force was illegal. As set forth above, however, the new evidence Defendants have presented distinguishes the present case from *Tenorio*. And, relevant to the second prong of a qualified immunity analysis, this widened gap between *Tenorio* and the present case further implicates the Supreme Court's admonition in *Bond*. Officer Fitch is entitled to qualified immunity unless the facts of *Tenorio* define the contours of excessive force so well that it would be clear to any reasonable officer that Officer Fitch's conduct was unreasonable in the situation he confronted. And as discussed above, the facts are no longer so similar.

Said differently, unconstrained by *Tenorio*, *Bond* takes on added significance. Comparing the present case to *Bond*, neither case involved a person suspected of committing a violent crime (the police officer in *Bond* explained to the man shot there "that they were simply trying to get him a ride," 595 U.S. at 10). In both cases, the person shot had a weapon other than a gun, was more than six feet away from police officers, was warned to drop the weapon, refused to do so, stepped (but didn't charge) toward the officers or toward an unobstructed path to the officers, the officers backed up before shooting, and the shooting occurred seconds after the officers warned the man to drop the weapon.

The primary distinction between the two cases is that the man in *Bond* raised the hammer in a threatening manner whereas Mr. Herrera kept his knife at his side. This is an important distinction because the raising of a weapon demonstrates hostility and an intent to levy an

65

immediate attack. But this is not the only way a person who is holding a weapon can demonstrate hostility. In the present case, Officer Fitch shot Mr. Herrera after repeatedly warning Mr. Herrera to stop and drop the knife and after Mr. Herrera continued to advance even as Officer Fitch attempted to retreat by backing up in a dark forested area that was full of tripping hazards. Thus, both the man in *Bond* and Mr. Herrera took actions that demonstrated hostile intent. Given this, and the other similarities between this case and *Bond*, it would be difficult to conclude that, although officers did not have notice that the conduct in *Bond* was unconstitutional in the Tenth Circuit, they nonetheless had notice that the conduct in this case was unconstitutional.

   C.   *Zuchel v. City & Cty. of Denver, Colo.* ("*Zuchel II*"), 997 F.2d 730 (10th Cir. 1993)

   In their original brief, Plaintiffs argued three cases provided Officer Fitch notice that his conduct here was unreasonable: *Tenorio*, 802 F.3d 1160, *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), and *Zuchel v. City & Cty. of Denver, Colo.* ("*Zuchel II*"), 997 F.2d 730 (10th Cir. 1993). Doc. 29 at 11. In their response to Defendants' second motion for summary judgment on qualified immunity grounds, Plaintiffs add *Graham* and *Larsen* to that list. Doc. 150 at 11. The Court has already analyzed the facts of the present case under *Tenorio*, *Graham*, and *Larsen* and concludes that, because those cases are factually distinct, they did not provide Officer Fitch fair notice that his conduct in this case would be unconstitutional.

   The Court makes the same conclusion with regard to *Zuchel II*. Importantly, *Zuchel II* did not involve an appeal of a qualified immunity decision. Instead, the case came to the Tenth Circuit after the City and County of Denver, rather than an individual asserting qualified immunity, suffered an adverse jury verdict, lost its motion for judgment notwithstanding the verdict, and appealed the denial of that motion. *Zuchel II*, 997 F.2d at 733. At trial, a jury found Denver liable for the actions of one of its police officers (who settled before trial) who shot a

man carrying fingernail clippers the officer believed to be a knife. *Id*. at 735. Specifically, police responded to a call of a man creating a disturbance at a restaurant. *Id*. When they arrived, they observed the man, Zuchel, in a heated exchange with a group of teenagers. *Id*. When the officers approached Mr. Zuchel, one of the teenagers shouted that Mr. Zuchel had a knife. *Id*. When Mr. Zuchel turned to the approaching officers, one of the officers shouted at Mr. Zuchel and then shot him four times. *Id*. A pair of fingernail clippers was then found next to Mr. Zuchel's body. *Id*.

Several witnesses testified at the trial. One described Mr. Zuchel as taking "three wobbly steps" toward the officer when the officer shot him from six to eight feet away. *Id*. at 736. This witness further stated, "it was no time after that he turned around that he was shot and laying on the ground," that Mr. Zuchel's hands were up in the air when he turned, that Mr. Zuchel did not charge toward the officer, and that they were "so far apart" that "there was no one in danger at that time." *Id*.

Another witness testified that Mr. Zuchel and the officer were about ten feet apart at the time of the shooting. *Id*. When Mr. Zuchel turned around, the witness testified, he was pointing over his left shoulder toward the teenagers and was looking to his left side. *Id*. The witness heard the officer tell Mr. Zuchel to drop it, even though she could not see anything in Mr. Zuchel's hands. *Id*. Mr. Zuchel's "right hand was at his side," and his "his left hand was still pointing backwards." *Id*. Mr. Zuchel then took three steps and the officer shot him, the witness testified. *Id.* The witness stated that Mr. Zuchel was not charging the officer and made no slicing or stabbing motions toward him." *Id*.

Because the case came to the Tenth Circuit on a motion for judgment notwithstanding the jury verdict, the Tenth Circuit could only reverse the jury's decision if evidence in Denver's

favor "so strongly support[ed] an issue that reasonable minds could not differ." *Id*. at 734. And here, the Tenth Circuit concluded, "the evidence supports the view that the shooting itself was not justified." *Id*. at 737.

*Zuchel II* did not provide notice to Officer Fitch that his conduct in the present case would violate Mr. Herrera's constitutional rights. First, that case involved review of a jury decision under a stringent judgment-notwithstanding-the-jury-verdict standard. Second, the officer there shot Mr. Zuchel even though he never saw a knife in Mr. Zuchel's hand and Mr. Zuchel had no knife in his hand. Further, the officer shot him almost immediately after giving him a command even though Mr. Zuchel's hand gestures indicated he was simply attempting to explain his interaction with the teenagers (or so a reasonable jury could conclude). These facts are more similar to the evidence originally presented to the Court, on which the Court denied Officer Fitch's motion for qualified immunity. They are not, however, similar to the revised facts the Court must now consider. Unlike in *Zuchel II*, Mr. Herrera ignored repeated commands to drop a knife, Officer Fitch clearly saw him holding a knife, Mr. Herrera advanced on Officer Fitch even after being warned to stop, Mr. Herrera closed the distance between himself and Officer Fitch, and Mr. Herrera did so in an area where Officer Fitch could easily trip and fall as Officer Fitch attempted to back away.

D. *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006)

*Walker* also fails to provide Officer Fitch notice that his conduct in this case was unreasonable. There, officers shot a man (Walker) who was holding a box cutter to his wrist in front of his family residence. 451 F.3d at 1157. Walker had led officers to the home after having been accused of stealing a vehicle and after having attempted to elude officers who were trying to pull him over and detain him. *Id*. The officer who first shot Walker did so from a distance of at

68

least 21 feet. *Id*. at 1159. Witnesses on the scene yelled to the officer that Walker did not have a gun. *Id*. at 1160. Although the officer claimed he believed Walker did have a gun, drawing all inferences from the evidence in the plaintiff's favor, the Tenth Circuit concluded this belief was not reasonable. *Id*. The time between Walker exiting his vehicle and being shot was less than twelve seconds. *Id*. During this time, Walker made no threats to anyone else and did not advance on anyone. *Id*. In sum, drawing all reasonable inferences in favor of Walker, the Tenth Circuit concluded that the officer shot a man holding a knife to his own wrist from a distance of at least 21 feet, even though the man was not advancing on or threatening officers, and where "there was no need to use deadly force to prevent him from fleeing and possibly harming others." *Id*. The district court denied qualified immunity to the officers who shot and killed Walker, and the Tenth Circuit affirmed. *Id.* at 1154, 1160-61. The circumstances in *Walker* are different from those in the present case, where Mr. Herrera advanced on a retreating Office Fitch, after having been commanded multiple times to drop the knife he was carrying.

The second officer who also shot Walker did so from a distance of 58 feet. *Id*. at 1160. As with the first officer, Walker "was not advancing on him and had not threatened him in any way." *Id.* The officer argued that, from the shots he heard, the fact that the other officer had ducked behind a car for cover, and the position of Walker's body and hands, that he reasonably believed he and others were in danger. *Id*. at 1160-61. The Tenth Circuit concluded, however, that whether this mistaken[16] belief was reasonable was a question for the jury. *Id*. Thus, drawing all inferences in favor of Walker, the second officer, from 58 feet away, shot a man who was standing still, holding a box cutter to his wrist, and threatening no one else. Again, this factual

---

[16] The court concluded that, under Walker's version of events, Walker "who posed only a danger to himself." *Id*. at 1160.

scenario is different than the one in the present case. *Walker*, therefore provided no notice to Office Fitch that his conduct in this case would be unconstitutional.

E.  Caselaw regarding the factual situation of the plaintiff holding a knife, not charging, and not making slicing or stabbing motions

Although the facts in the present case are distinguishable from those in *Tenorio*, *Zuchel II*, and *Walker*, this does not end the Court's analysis. The Tenth Circuit in *Walker* stated that prior Tenth Circuit precedent "established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." 451 F.3d at 1160 (citing *Zuchel II*, 997 F.2d at 735-36). The Tenth Circuit quoted this language in *Tenorio*, 802 F.3d at 1165-66. In the present case, Officer Fitch only had reason to believe that Mr. Herrera was carrying a knife, evidence drawn in Plaintiffs' favor indicates he was walking toward, not charging, Officer Fitch, and he kept his knife at his side rather than wielding it in a menacing manner. Thus, if the *absence* of a gun, charging, and menacing motions with a weapon necessarily means an officer uses unreasonable force *regardless of what other evidence of hostility might be present*, Officer Fitch violated Mr. Herrera's constitutional rights and was on notice that his actions would do so.

Reading the Tenth Circuit's absence-of-three-factors language in context, however, demonstrates that situations could arise in which deadly force is reasonable even in the absence of the three factors the Tenth Circuit identified in *Tenorio* and *Walker*. Start with the oft-cited case of *Larsen*. There, the Tenth Circuit, citing *Walker*, directed that, "In assessing the degree of threat facing officers" district courts should consider "whether any hostile motions were made with the weapon towards the officers." *Larsen*, 511 F.3d at 1260 (second *Larsen* factor). After citing *Walker* as authority for its list of *non-exclusive* factors, the Tenth Circuit in *Larsen* then

emphasized, "But in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id*. If *Walker*'s absence-of-three-factors language means all other evidence of hostility becomes irrelevant once the absence of these three factors is established, this *Walker* language comes into tension with the *Larsen* court's directive to consider the totality of the circumstances. *See Est. of George v. City of Rifle, Colorado,* 85 F.4th 1300, 1317–18 (10th Cir. 2023) ("The second *Larsen* factor asks 'whether any hostile motions were made with the weapon towards the officers.' The undisputed evidence in this case establishes that George never pointed his handgun at either officer or anyone besides himself. Thus, viewed in isolation, this factor would weigh in favor of the plaintiffs. But, as we have noted, the *Larsen* factors are 'non-exclusive' and we must always consider 'the totality of the circumstances.' Despite the fact that George never pointed his handgun at anyone besides himself, it is undisputed that George ignored numerous verbal orders from both Ryan and McNeal to drop his weapon." (quoting *Larsen*, 511 F.3d at 1260)).

As the Court stated in its June 28, 2022 Opinion, "This quote from *Walker* is not always the end of the story" as the Court "does not interpret *Tenorio* as holding that where a suspect is carrying only a knife, not charging, and not holding the knife in a threatening manner, deadly force is per se unreasonable, *regardless of whatever other facts might exist*." Doc. 40 at 17 (emphasis in original). A suspect can manifest hostility in other ways than "charging" and "making slicing or stabbing motions." As the Court hypothesized in its previous Opinion, "Suppose, for instance, the knife-wielder, although holding the knife at his side, had arms flexed, looked extremely agitated and was simultaneously yelling in profane language that he intended to plunge his knife into the officer's heart." Doc. 40 at 17 n.7. *Walker* says nothing about distance. Must an officer allow this hypothetical knife-wielder to walk within a foot of the officer

where he could easily strike a deadly blow? An obvious response to this answer is that, rather than letting the knife-wielder walk to within a foot of the officer, the officer should retreat. But what if the officer cannot retreat or if, like here, the officer is attempting to retreat but the knife wielder is nonetheless able to close the gap? Does the officer then have to choose between shooting an assailant (and thereby, as a matter of law, violating his constitutional rights) or the likelihood of having a knife plunged into his heart? The Court does not read *Tenorio* and *Walker* as forcing such a Hobson's choice on an officer who is placed in such a situation. *See Lennen v. City of Casper, Wyoming*, No. 21-8040, 2022 WL 612799, at *8 (10th Cir. Mar. 2, 2022) (sword-yielding man's "disregard of the Officers' commands further demonstrated his hostile intent.").

Since the Tenth Circuit quoted this published language in *Walker*, numerous district courts have granted qualified immunity in situations where a police officer shot a knife-wielder who was not charging the police officer or anyone else and who was not waving the knife in a menacing manner. *See e.g.*, *Jackson v. City of Wichita, Kansas*, No. CV 13-1376-KHV, 2017 WL 106838, at *8 (D. Kan. Jan. 11, 2017) (finding violation of constitutional rights but no clearly established law); *Est. of Castaway by & through Castaway v. Traudt*, No. 116CV01763DDDMEH, 2019 WL 6700512, at *8 (D. Colo. Dec. 9, 2019) (finding no constitutional violation); *Baca v. Cosper*, No. 2:22-CV-0552 RB/GJF, 2023 WL 5725427, at *3 (D.N.M. Sept. 5, 2023) (finding deadly force to be reasonable).

### 3. Officer Fitch is entitled to qualified immunity on Plaintiffs' Fourth Amendment claim.

In sum, the Court finds that, under the new evidence the parties present, no reasonable jury could find that Officer Fitch's actions were unreasonable. Thus, the Court finds no constitutional violation under prong one of the qualified immunity analysis. Under prong two of the qualified immunity analysis, no reasonable police officer could read the above cases and

conclude that shooting a man who advances on a police officer with a knife, repeatedly ignores the officer's commands to stop, closes the gap on the officer while the officer is trying to back-away, and gets to no more than 17 feet from the officer, is unconstitutional. *See Malley v. Briggs*, 475 U.S. 335, 335 (1986) ("[Q]ualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). And although the Court need only find for Defendants on one prong in order to grant Officer Fitch qualified immunity, *Pearson*, 555 U.S. at 236, it finds that Plaintiffs have failed to meet their burden on both prongs of qualified immunity. The Court thus grants summary judgment in Defendants' favor as to Plaintiffs' Fourth Amendment claim against Officer Fitch.

### 4. Because the Court finds that Officer Fitch did not violate Mr. Herrera's constitutional rights, the Court is inclined to find that Plaintiffs' municipal liability claim against Angel Fire also fails.

Having now granted summary judgment in Defendants' favor as to Plaintiffs' Fourth Amendment claim against Officer Fitch, the Court turns to the related issue of Plaintiffs' Fourth Amendment claim against Defendant Village of Angel Fire ("Angel Fire") in count IV of Plaintiffs' complaint. Doc. 1-3 at 7-8. Under *Monell v. Department of Social Services of City of New York*, local governing bodies face Section 1983 liability where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690-91 (1978); *see also Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020) ("To state a claim against the County, the plaintiffs must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference.").

Plaintiffs' *Monell* claim rests on holding Angel Fire responsible for the actions of Officer Fitch. *See* Doc. 1-3 ¶¶ 72-75 (alleging that Officer Fitch used excessive force against Mr.

Herrera and Angel Fire's "practice, policy, or custom" of hiring, supervising, and training law enforcement officers caused Mr. Herrera's injury); *see also* Doc. 142 at 11 ("Plaintiffs' *Monell* claim is based on Angel Fire's failure to train Defendant Fitch."). This claim likely fails because a "municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). That is, "[a] § 1983 suit against a municipality for the actions of its police officers requires proof that (1) an officer committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the constitutional deprivation that occurred. But without the predicate constitutional harm inflicted by an officer, no municipal liability exists." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008) (internal citations omitted). Because the Court has now concluded that Officer Fitch did not commit an underlying constitutional violation, Plaintiffs' *Monell* claim likely fails.

Plaintiffs' *Monell* claim (count IV against Angel Fire) is one target of Defendants' Motion for Partial Summary Judgment.[17] Doc. 127; *see also* Doc. 128 (Defendants' brief in support); Doc. 142 (response); Doc. 152 (reply). In briefing the issue, however, the parties focus on whether Plaintiffs can present evidence of a policy or custom which denied Mr. Herrera his constitutional rights. Docs. 128 at 8-9, 142 at 11-12. If the Court finds no underlying constitutional violation, it may not need to reach the issue of policy or custom. Because the parties did not brief this issue, however, the Court presently gives notice to the parties of its intent to grant summary judgment and an opportunity to respond. *See* Fed. R. Civ. P 56(f)

---

[17] In this motion, Defendants also move for summary judgment on count II of Plaintiffs' complaint for negligent hiring, supervision, and training. Doc. 128. Count II is also the subject of Plaintiffs' motion for summary judgment (Doc. 139) and Plaintiffs' motion for judicial notice (Doc. 140). The Court will address count II below, together with Plaintiffs' other state-law claims.

("After giving notice and a reasonable time to respond, the court may . . . grant the motion on grounds not raised by a party; or consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."). Accordingly, within 14 days of the entry of this order, the parties may, but are not required to, file supplemental briefs addressing whether the Court's ruling on the constitutionality of Officer Fitch's conduct forecloses Plaintiffs' *Monell* claim (count IV against Angel Fire). If a party files a supplemental brief, the other side may, within 14 days of the filing, file a response brief.

**5. The Court is inclined to decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims.**

Lastly, in their renewed motion for summary judgment, Defendants seek summary judgment on Plaintiffs' state-law claims, arguing that all fail under the reasonableness standard analyzed in relation to the Fourth Amendment claim. Doc. 136 at 19-24. Before addressing this argument, the Court considers whether it should decline to exercise supplemental jurisdiction over the state-law claims. That is, given that the Court has resolved Plaintiffs' Fourth Amendment claim against Officer Fitch, and given that it is inclined to resolve the Fourth Amendment *Monell* claim against Angel Fire, all that would remain are Plaintiffs' state-law claims. *See* Doc. 1-3 (count I, battery; count II, negligent hiring, training, and supervision; count III, violations of rights guaranteed by Article II, Section 10 of the New Mexico constitution; count V, wrongful death; and count VI, loss of consortium).

The Court has supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367. *See also* Doc. 1 ¶ 8 (notice of removal, citing supplemental jurisdiction over the state-law claims). Nonetheless, the Court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Tenth Circuit has indicated that if, prior to trial, "all federal claims have been dismissed, the

court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1238 (10th Cir. 2020) (reversing a district court for failing to decline supplemental jurisdiction). Even where the parties have expended considerable effort in litigating the state-law claims in the federal forum, including conducting full discovery, it is appropriate to decline to exercise supplemental jurisdiction because that discovery can be used in state court. *Huntsinger v. Bd. of Dir. of E-470 Pub. Highway Auth.*, 35 F. App'x 749, 759-60 (10th Cir. 2002); *see, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (affirming a district court decision to decline supplemental jurisdiction after granting summary judgment on the federal claims). The Tenth Circuit, however, has also indicated that it is appropriate for district courts to decide the state-law claims when resolution of the federal claims "effectively resolves" the state law claim. *Est. of George v. City of Rifle, Colorado*, 85 F.4th 1300, 1323 (10th Cir. 2023).

Given recent guidance from the New Mexico Court of Appeals, the Court does not find that its ruling on the reasonableness of Officer Fitch's conduct under the Fourth Amendment will necessarily resolve all of Plaintiffs' state-law claims. *See Hernandez v. Parker*, 2022-NMCA-023, ¶ 32, 508 P.3d 947 ("The parties do not propose, and we do not adopt, a specific privilege as a defense to a civil claim of assault and battery brought against a police officer. Nevertheless, the traditional defenses for law enforcement to assert in response to civil assault and battery claims are not the same as the objectively reasonable officer standard that is at the root of Fourth Amendment analysis." (internal quotation marks and citation omitted)); *see also Shaw v. Granvil*, No. CV 14-1078 SCY/KBM, 2016 WL 10267676, at *11 (D.N.M. May 23, 2016) ("[T]he analysis of whether a defendant law enforcement officer committed battery under New

Mexico law is different than the analysis of whether that same officer should be held liable for allegedly violating a plaintiff's federal constitutional rights.").

Thus, given the Court's inclination to dismiss all of Plaintiffs' federal claims, the Court is also inclined to decline supplemental jurisdiction over Plaintiffs' remaining state-law claims. Because the Court has not yet resolved Plaintiffs' remaining federal claim (count IV against Angel Fire), however, it takes under advisement Defendants' renewed motion for summary judgment as to the state-law claims until it issues a decision on Defendants' pending motion for summary judgment on Plaintiffs' remaining federal claim.[18]

## CONCLUSION

For the reasons discussed above, the Court GRANTS IN PART Defendants' Renewed Motion for Summary Judgment (Doc. 129) as to Plaintiffs' Fourth Amendment claim against Officer Fitch (count IV) and TAKES UNDER ADVISEMENT the motion as to Plaintiffs' state-law claims.

Additionally, under Rule 56(f), the Court provides the parties an opportunity to file supplemental briefs regarding Defendants' Motion for Partial Summary Judgment (Doc. 127). Within 14 days of the entry of this order, the parties may, but are not required to, file supplemental briefs addressing whether the Court's ruling on the constitutionality of Officer

---

[18] In its prior Opinion, the Court denied Defendants' motion for summary judgment as to the state-law claims, finding that because a reasonable juror could find Officer Fitch's use of deadly force to be unreasonable, Plaintiffs' state-law claims also survived. Doc. 40 at 21-22. Because the Court, at that time, was not dismissing the federal claims, it had no occasion to consider whether it should decline supplemental jurisdiction once the federal claim has been dismissed, as it does now.

Fitch's conduct forecloses Plaintiffs' *Monell* claim (count IV against Angel Fire). If a party files a supplemental brief, the other side may, within 14 days of the filing, file a response brief.


STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE